# JAMES POTT & CO. and Others *vs.* SAMUEL D. SCHMUCKER, Trustee.

*Partnership—Separate Business Carried on by One Partner Under a Corporate Organization—Indebtedness of the Partner to the Firm—Rights of Individual Creditors of an Insolvent Partner and the Trustee in Insolvency of the Firm—One Man Corporation—Control of Firm's Business by One Partner—Acceptance of Deposits by Insolvent Bankers—Fraud—Affirmance of Contract.*

Where one of the members of a partnership engages in a separate business of his own, becoming in this business a debtor to the firm, then, upon the insolvency of such partner, the firm of which he is a member is not entitled to share equally with his individual creditors in the distribution of the assets of such separate business.

If, in such case, the firm of which the insolvent debtor is a member were allowed to compete with that debtor's individual creditors in the distribution of his assets, he would, to the extent of his interest in the firm, be competing with his own creditors.

When in such case the firm also becomes insolvent, its trustee, whether a conventional trustee or one appointed in insolvency, has no greater rights against the individual assets of the insolvent partner than the firm itself would have had.

There are two cases in which the creditor firm of which an insolvent is a member may prove in competition with his individual creditors : 1. Where money has been fraudulently abstracted from one estate and applied for the benefit of the other. 2. Where some of the members of a partnership form a distinct body for carrying on a distinct trade and the articles of one trade have been furnished by one firm to the other.

In certain cases a debtor corporation and the person who owns all of its capital stock may be treated as identical.

When a member of a firm conducts a separate business venture of his own under a corporate organization, of whose stock and property he is the sole owner, and such corporation becomes indebted to the firm, then upon the insolvency of both the firm and the corporation, the separate creditors of the latter are entitled to priority of payment out of the assets of the corporation as against the trustee in insolvency of the firm.

When one partner puts the other in absolute possession of the partnership funds and leaves to him the sole management of the concern,

this is *prima facie* an implied consent to any measures he may adopt regarding the joint property, and joint creditors must abide by the consequences of such arrangement.

One of the members of a banking firm carried on a separate business, which he afterwards organized as a corporation. He took the entire capital stock, but allotted four shares of it to four employees. He was the treasurer of the corporation, signing all notes and checks, and furnished all the money for its business. The corporation kept an account with the banking firm and overdrew the same to a large extent. The other members of the firm knew that their partner was overdrawing in the name of the corporation, and no objection was made thereto, but it was considered by all the parties that these overdrafts were so much cash contributed by such partner to the capital of his corporation and not as a debt due by the corporation to the banking firm. The firm became insolvent and plaintiff was appointed permanent trustee. The corporation also became insolvent and receivers were appointed who collected its assets. The plaintiff claimed that if the charter of the corporation was invalid, then the funds belonged to said partner individually, and consequently passed to him as the trustee ; or, if the charter were valid, then as trustee of the firm he was a creditor of the corporation to the amount of the overdrafts and entitled as such to share equally with other creditors of the corporation in the distribution of the assets. *Held,*

1st. That the corporation was validly formed, since the requirements of the incorporation law had been substantially complied with. .

2nd. That since the corporation was in reality the individual business of the partner who owned all of its capital stock, the creditors of the corporation are entitled to be paid out of its assets in the hands of the receivers before the trustee in insolvency of the banking firm can claim to be paid the indebtedness due to it by the corporation, and before the trustee in insolvency of the partner individually can demand any part of the funds.

3rd. That if the creditors of the firm were depositors whose money was taken when the firm knew itself to be insolvent, yet they had not rescinded the contract of debtor and creditor created by the deposit on the ground of fraud, but had affirmed the contract by proving their claims in the insolvency proceedings, and consequently these creditors have no greater equity than other creditors of the insolvent firm.

Appeal from a decree of the Circuit Court of Baltimore City (HARLAN, C. J.)

The cause was argued before McSHERRY, C. J., BRYAN, BRISCOE, PAGE, BOYD and RUSSUM, JJ.

*W. Burns Trundle* and *Edgar H. Gans* (with whom were *Hinkley & Morris* and *Wm. J. O'Brien, Jr.*, on the brief), for the appellants.

1. Where A and B, partners, are insolvent, the firm creditors cannot prove in competition with the separate creditors of A or B against their respective individual assets ; nor can the separate creditors of A or B prove in competition with the firm creditors against the assets of the firm.  *McCulloh* v. *Dashiell*, 1 Harr & Gill, 96; *Glenn* v. *Gill*, 2 Md. 15 ; *Simmons* v. *Tongue*, 3 Bland, 356 ; *Maennel* v. *Murdock*, 13 Md. 179 ; *Berry* v. *Harris*, 22 Md. 37 ; *Hull* v. *Deering*, 80 Md. 433 ; *Murrill* v. *Neill*, 8 How. 426.

2. Where the firm of A and B loans or advances money to A, whereby A becomes indebted to the firm, and the firm and its members are adjudicated insolvent, the assignee of the firm cannot prove for this debt, against the separate estate of A, in competition with *his* creditors ; nor, conversely, if the firm is indebted to A, can his assignee prove against the firm assets, in competition with the firm creditors for that debt.  *Ex parte Harris*, 2 V. & B. 210 ; *Ex parte Reeve*, 9 Vesey, 589 ; *Ex parte Emly*, 1 Rose, 64 ; *Ex parte Sillitoe*, 1 Glyn & J. 382 ; *Ex parte Smith, Ibid*, 74 ; *Ex parte Collinge*, 4 DeG. J. & S. 533 ; *Ex parte Maude*, L. R. 2 Ch. App. 555 ; *Reid* v. *Bailey*, L. R. 3 App. Cas. 94 ; *In re Hamilton*, 1 Fed. Rep. 805 ; *In re Lane*, 2 Lowell, 334; *Honssell's Appeal*, 45 Pa. St. 484; *In re McEwen*, 6 Bissell, 294 ; *Weaver* v. *Weaver*, 46 N. H. 188.

But, it is said, this principle is *inapplicable*, because The Baltimore Publishing Company was *a corporation ;* that a Court of Equity cannot look behind the certificate of incorporation to reach the merits of the case.   This we deny, and, on the contrary, maintain :

3. Whenever it becomes necessary, in order to work out substantial justice, for example, in applying settled equitable principles in the distribution of the assets of an insol-

vent corporation, equity will look behind the mere form of the corporate entity, and decree with respect to the rights of the *individual* or *individuals* composing the corporation. *Bank* v. *Devaux*, 5 Cranch, 61 ; *Kansas Pacific, &c. Co.* v. *Atchison, &c. Co.*, 112 U. S. 415 ; *Mason* v. *Pewabic Mining Co.*, 133 U. S. 59.

The proof shows that Johns H. R. Nicholson owns the assets of The Baltimore Publishing Company as his separate property, subject to the claims of its creditors. That The Baltimore Publishing Company is but a *synonym* for Johns H. R. Nicholson. Johns H. R. Nicholson is surviving partner in the firm of J. J. Nicholson & Sons, originally composed of Johns, Charles and Andrew. It is perfectly well settled, that the creditors of Johns H. R. Nicholson, trading as The Baltimore Publishing Company (incorporated), cannot prove against the assets of the firm of J. J. Nicholson & Sons, because, presumably, they gave credit to the separate estate of Johns, consisting of the assets of The Baltimore Publishing Company, just as the creditors of J. J. Nicholson & Sons are supposed to have given credit to the assets of the firm.

Suppose that the firm of J. J. Nicholson & Sons, being insolvent, were indebted unto Johns H. R. Nicholson, doing business as a corporation, called The Baltimore Publishing Company, a going concern, in the sum of $75,000 ; would he be allowed to prove, under the name of The Baltimore Publishing Company, in competition with the firm creditors ? Clearly not, because any dividend allowed on that claim would be *his*, would belong to *him*, as the *owner* of The Baltimore Publishing Company, and he, being a member of the firm of J. J. Nicholson & Sons, would thus come in competition with *his own* creditors.

Conversely, when the assets of The Baltimore Publishing Company, which are his separate estate, are in the Court for distribution among its creditors, can the creditors of the firm of which he is a member, through their trustee, prove in competition with its creditors ? Clearly not, if The

Baltimore Publishing Company is but another name for Johns H. R. Nicholson; if *its* assets are *his* assets, as in truth they are, as the record fully proves. If then the assets of this company are the *separate* property of Johns H. R. Nicholson, by all the authorities, the creditors of the firm of J. J. Nicholson & Sons, through their assignee, cannot prove against said assets until the separate creditors of the company are paid in full; the surplus only will go to the appellee as trustee in insolvency of the firm, to be by him distributed to the creditors of the firm. Upon what ground, is it said, this settled principle of equity should be ignored? Because, and solely because, The Baltimore Publishing Company is a *corporation*—an *artificial entity*. But that it is to be viewed in the light of a legal entity is a mere fiction, existing only in idea. It has place to enable the company, by its corporate name, to make contracts, to acquire property, to sue and to be sued, and to preserve the limited liability of the stockholders, but no further. When its recognition would militate against a fixed rule of equity and work a wrong to its creditors, by depriving them of the benefit of that rule, the fiction of legal entity must yield to the fact of actual identity. It is The Baltimore Publishing Company *alias* Johns H. R. Nicholson. A Court of Equity will never allow a fiction to prevail to subvert just rights. *State* v. *Standard Oil Co.*, 49 Ohio St. Rep. 137, 177, 179. That a Court of Equity in dealing with a corporation will regard substance rather than form is further illustrated by the case of *Swift* v. *Smith*, 65 Md. 428.

*Samuel D. Schmucker* (with whom was *George Whitelock* on the brief), for the appellee.

I. It is essential to the correct decision of the questions at issue to first determine whether the Baltimore Publishing Company was a corporation or was simply Johns Nicholson individually trading under the name of the Baltimore Publishing Company. If the corporate existence of the company be upheld one set of legal relations exists and corre-

sponding results follow, but if it be not upheld, quite another and different set of legal incidents controls the situation and different consequences ensue.  Any attempt to decide the issues in the case by setting up and knocking down the corporation according to the exigencies of the particular situation or by maintaining its existence for some purposes and ignoring it for others, must lead to confusion and imperil, if not entirely defeat, the effort to arrive at a just and clear solution of the questions at issue.

Upon the question as to whether or not the Baltimore Publishing Company is to be regarded as a corporation the appellee respectfully submits : -

1. The certificate of incorporation fails to comply with the law, in that it does not state the residence of the incorporators nor make the name of Baltimore City part of the corporate title.  The parties having failed to comply with the statutory requisites in attempting to form the corporation cannot indirectly or upon the principle of estoppel create a corporation for any purpose.  *Boyce* v. *Trustees, &c.*, 46 Md. 359.  The certificate of the Judge to the charter, having been made prior to the Act of 1888, chapter 454, is not conclusive as to its sufficiency.  The question being one relating to the *creation* of the corporation, it need not be raised by the State, but may be raised like other questions of fact in any case.  *Bonaparte* v. *B. & H. R. R.*, 75 Md. 340.

2. Nicholson being the equitable owner of all of the stock of the company, which was one organized purely for private gain, did not keep up or maintain the corporation, but openly repudiated it and asserted personally and through his agents that the entire establishment was his individual property.  He offered it for sale.  He did sell the " Catholic Mirror," which formed part of it.  He took the lease to the company's place of business in his own name.  His uniform and persistent repudiation of the corporation and assertion of individual ownership of the business constituted an election on his part to treat the assets as his individual

estate within the principles laid down by the case of *Swift v. Smith, Dixon & Co.*, 65 Md. 428–432–3–7.

II. *If the corporation be upheld,* then the assets which produced the fund in Court were *its* assets and the firm of Nicholson & Sons were *its* creditors for the $76,340.44 of overdrafts and the appellee represents their claim and stands before the Court in the attitude of a *creditor of the corporation.*

It has been judicially determined that the title to the partnership assets of the firm of J. J. Nicholson & Sons devolved upon and is now vested in the appellee as permanent trustee of the surviving partner of the firm. This Court made a similar decision in the case of *Pinkney* v. *Lanahan,* 62 Md. 447. The distribution of the corporate assets must be made among its creditors upon principles of equity. *Equality is equity,* and the distribution of the fund in Court among the creditors must be equal and *pro rata* unless some of them can show that they have a lien on the fund. *Pomeroy's Equity Jurisprudence,* secs. 405–6–7 ; *Story's Equity Jurisprudence,* sec. 554. The appellants have *no lien on the fund.* Their debts are of no higher quality or degree than that of Nicholson & Sons. Many of them are for money loaned or paper discounted just as that of the Nicholson firm. This is especially true of the claims of the several national banks.

The appellee does not understand the appellants to claim that the facts relied on by them create *an actual lien* in their favor upon the fund in Court, but he understands them to assert that the facts give them an equity to have the claim of the firm of Nicholson & Sons, which the appellee represents, postponed in payment to the claims of the appellants. The supposed equity set up by the appellants is based on the representations made to certain of them by or on behalf of Johns Nicholson that *he* owned the assets and would be responsible for the debts. They assert that they relied on these representations, and that therefore the claim of the Nicholson firm should not be allowed to participate

until they have been paid in full. In other words the doctrine of estoppel is invoked against the claim of the appellee. These representations made on behalf of Johns that he owned the Publishing Company and had a large investment in it and would be personally responsible for its obligations were substantially true. He was the equitable owner of the Publishing Company. He had a large investment in it. He could agree to be personally responsible for its debts if he desired to do so. The contention of the appellants might have some force if it were asserted against an attempt by Johns Nicholson to collect a debt due to him individually from the corporation, but the facts of this case afford no defence to the claims of the banking firm of Nicholson & Sons to be repaid the overdrafts made on them by the Publishing Company and paid by them and charged to it in the ordinary course of business between the two concerns in the relation of banker and depositor. There is no pretense that Johns represented that the *firm of Nicholson & Sons* owned the Publishing Company's business or would be responsible for its debts or would see them paid or anything of that kind. There is no evidence at all that the other members of the firm of Nicholson & Sons ever knew that Johns had permitted the representation to be made to the Publishing Company's creditors that even he personally would be responsible for its debts.

If the equities of the several creditors of the Publishing Company are to be considered and set off or balanced one against the other, then the appellee submits that he has quite as strong a claim to the Court's favor resting upon the equities of the case as the appellants have. The evidence in this case, as well as the records of the other Nicholson cases tried in this Court, show that the firm of Nicholson & Sons were insolvent for years prior to their failure. They had no money of their own. What they used in their business was mainly the money of their depositors, not in law it may be, but in morals certainly. The record shows that they owed their depositors $750,000 at

the time of their failure, which was about three-fourths of
their entire indebtedness. It is fair to assume that by far
the larger part of the $76,340.44, which the Publishing
Company got from them, was practically the money of their
depositors. Nicholson & Sons were so hopelessly insol-
vent for some time prior to their failure that they must have
known it. They therefore committed a gross fraud upon
their depositors in taking deposits from them. The appellee
as permanent trustee represents these defrauded depositors,
who are among the creditors of the Nicholson firm. *Cragie*
v. *Hadley*, 99 N. Y. 131 ; *City of Sommerville* v. *Beal*, 49
F. R. 790 ; *St. Louis & S. F. R. R.* v. *Johnson*, 133 U. S.
566.

Johns may have committed a fraud upon the appellants
who sold goods or lent money to the Publishing Company
by falsely representing that he was able to pay them and
would do so, but he committed a gross fraud on the depos-
itors of the Nicholson firm when knowing that firm to be
insolvent he participated in receiving their deposits and
turning them over to the Publishing Company, which prac-
tically belonged to him and was also insolvent. To follow
funds obtained under such circumstances it is not necessary
to identify them. It is only necessary to show that the
fund into which they have gone has been swelled by their
presence. So strong is this equity that if the fund has
come in *custodia legis* it is not even necessary in such case
to file a bill to establish the petitioner's claim, but the
Court will direct the money to be paid upon a summary
application by petition. *Massey* v. *Fisher*, 62 F. R. 968 ;
*People* v. *Bank of Danville*, 39 Hun. 190. Without con-
tending that his affirmative equity is so strong that he could
in the present case follow the funds of the depositors in the
Nicholson firm into the hands of the Publishing Company
or its liquidator and recover them to the exclusion of the
other creditors of that company, or that the depositors
themselves could so follow their funds, the appellee does
contend that the circumstances of the case afford him a de-

fensive equity more than strong enough to overcome any
equity which the appellants have to be paid in preference
to him.

III. If, on the other hand, *the Publishing Company was
not a lawful corporation*, then its assets were the individual
property of Johns Nicholson and the fund in Court must
be awarded to the appellee *not as a creditor* of Johns, but
as *his successor in title, i. e.,* his trustee in insolvency.
*Buschman* v. *Hanna,* 72 Md. 1 ; *Riley* v. *Carter,* 76 Md. 608.
The awarding of the fund to the appellee under the circum-
stances would not be hostile or in opposition to the rights
of the appellants who claim to be creditors of Johns, but it
would simply be a transfer of his assets to his trustee in in-
solvency *for the benefit* of his creditors *subject to all of their
liens and equities* for distribution among them in that forum
which in cases of insolvency has exclusive jurisdiction. It
would only be such a transfer of these assets to the insol-
vent Court for distribution as was made of the other Nichol-
son assets by the decree in the case of *Riley* v. *Carter.*

The appellants at the trial in the Court below laid much
stress upon the doctrine that, in the distribution of the as-
sets of a partner of a firm, the copartnership estate cannot
prove against the individual estate until the individual cred-
itors have been paid, nor can the individual estate prove
against the copartnership estate until the copartnership
creditors have been paid. They attempted to apply this
proposition to the case at bar and contended that if the as-
sets are to be regarded as the individual property of Johns
Nicholson, then the appellants are entitled to be treated as
individual creditors of Johns and the appellee must be re-
garded as the representative of the partnership estate of
Nicholson & Sons and his claim must be postponed to those
of the appellants. This contention cannot be maintained
because the appellee claims the fund, if it is to be regarded
as the individual property of Johns Nicholson, *not as the
representative of the partnership estate, nor as a partnership
creditor, nor even for distribution among the partnership cred-*

*itors.* He does not, in that event, claim the fund *as a cred-itor at all*, but asserts that the title to it has by law devolved on him as the trustee in insolvency of Johns Nicholson for distribution among his individual creditors. Therefore no question of marshaling of assets between individual and partnership creditors can arise in this case.

Apart from the exclusive jurisdiction of the Insolvent Court to distribute the individual assets of Johns Nicholson, who is an insolvent, it is submitted that the present case is not an appropriate proceeding in which to make such distribution. This case was not instituted for the distribution of *his* assets, no notice has been given to *his* creditors to file their claims in the case nor were they heard in the Court below. If this Court were now to remand the case to the Circuit Court with directions to advertise for his creditors and make distribution among them, it is submitted that it would be directing the Circuit Court to exercise a jurisdiction which is exclusively committed by law to the Insolvent Court.

McSHERRY, C. J., delivered the opinion of the Court.

This is another of the many cases which have resulted from the failure of the banking house of J. J. Nicholson and Son in January, eighteen hundred and ninety-two ; but it differs widely from those that have preceded it, and involves quite distinct and dissimilar principles and doctrines.

In eighteen hundred and eighty-four Johns H. R. Nicholson, one of the members of the firm of J. J. Nicholson and Son, purchased the assets, the good will and the business of John B. Piet and Company who had recently theretofore failed whilst largely indebted to Johns H. R. Nicholson individually. Mr. Nicholson thereafter continued the business of Piet and Company on his own account, but under the name of the Baltimore Publishing Company, until March, eighteen hundred and eighty-five, when he procured a certificate of incorporation in which the capital stock was fixed at twenty-five thousand dollars. The whole of this stock

was taken by Johns H. R. Nicholson, but to effect an organization of the corporation, whose charter name was the Baltimore Publishing Company, he allotted four shares of the stock to four of his employees to be held by them only so long as they remained in his service. He was the treasurer of the company, signed all notes and checks given by it, and furnished all the money needed to conduct its business. He owned the whole of the assets of the concern and the business carried on in its name was his business, confessedly no one else having any interest therein whatever. He was in reality himself the Baltimore Publishing Company, and this fact was so stated and represented to the various persons who became, on the faith of this assurance, its creditors. When the banking house of J. J. Nicholson and Son failed on January the fourteenth, eighteen hundred and ninety-two, it was discovered that there appeared upon its ledgers an overdraft indebtedness of seventy-six thousand dollars apparently due to it by the Baltimore Publishing Company. The members of the firm were aware, as this overdraft indebtedness grew, that Johns H. R. Nicholson was overdrawing in the name of the Baltimore Publishing Company. When the Nicholsons suspended they appointed trustees under a deed of trust for the benefit of creditors, but being proceeded against under the insolvent law and being adjudged insolvents, a permanent trustee in insolvency was elected who displaced the conventional trustees. Before, however, the conventional trustees were superseded they filed a bill in equity against the Baltimore Publishing Company, alleging that the company was insolvent and praying that it be so declared, and asking that receivers be appointed to take charge of its assets and to reduce them to money for the settlement of its indebtedness. To this bill an answer was filed, and subsequently receivers were appointed who converted the assets into money which they now have in the Equity Court for distribution. Later on Nicholson and Son and Johns H. R. Nicholson were adjudged insolvent, as already stated, and Mr. Samuel D.

Schmucker was elected their trustee in insolvency. Mr. Schmucker then filed a supplemental bill wherein he made two alternative claims with respect to the funds in the hands of the Publishing Company's receivers. These claims were, first, that the charter of the Publishing Company was invalid and that therefore the funds belonged, not to the corporation, but to Johns H. R. Nicholson individually, and consequently the title to them passed, upon his being adjudged an insolvent, to his trustee, Mr. Schmucker; and, secondly, if the charter was valid, then Mr. Schmucker as trustee in insolvency of the firm of J. J. Nicholson and Son, claimed to be a creditor of the Publishing Company to the amount of the above-mentioned overdraft, and so claiming, asserted his right to participate *pari passu* with all other creditors of the Publishing Company in the distribution of the funds in the possession of the receivers. This supplemental bill was answered. At the hearing the evidence taken under the original bill as well as that taken under the supplemental bill was considered and is in the record now before us. This evidence shows that Johns H. R. Nicholson treated this overdraft not as a debt due by the Publishing Company, but as capital of his own advanced to the company; and there is nothing in the record to contradict this, apart from the form of the entries on the books of the firm. The Circuit Court of Baltimore City decreed, first, that the Baltimore Publishing Company's charter was valid; and, secondly, that the insolvent firm of Nicholson and Son, through the trustee, Mr. Schmucker, was entitled as a creditor of the Publishing Company to the extent of the overdraft, to share *pari passu* in the receivership funds with the creditors of the Publishing Company. From the latter or second clause of this decree the creditors of the Publishing Company have appealed.

The question then is: Are the funds derived from the sale of the Publishing Company's assets applicable under the facts above stated, to the payment in the first place of the debts due by the Baltimore Publishing Company ex-

clusive of the alleged overdraft indebtedness ; or does the overdraft stand on the same footing with the undisputed debts of the Publishing Company, entitled to be paid *pari passu* with them ?

If there had been no corporation, and if the business of the Publishing Company had been conducted openly and ostensibly as the individual business of Johns H. R. Nicholson in his own name, there can be no doubt, according to firmly settled principles, that the creditors of the firm of J. J. Nicholson and Son, of which firm Johns H. R. Nicholson was a member, would not have been entitled to be paid out of the funds arising from the sales of Johns H. R. Nicholson's individual property until his individual creditors were first paid therefrom in full. And this is so because the individual property of a member of a firm is applicable in the first instance to the payment of his individual creditors, just as the social assets are liable for the firm debts in preference to the debts due by the copartners personally. This doctrine is so generally accepted and so familiar that we need not pause to demonstrate it. *McCulloh* v. *Dashiell's Admr.*, 1 H. & G. 96 ; *Hull* v. *Deering*, 80 Md. 424.

The application of this doctrine to varying conditions of facts has logically led to the development of a corollary, with which we are, on this appeal, more immediately and directly concerned. It has often happened in the diversity of business enterprises that one of the partners of a firm has also been engaged in a separate venture of his own, and that in the latter business he became a debtor to his own firm for advances or loans of money made by the firm to him. In other words, as an individual he was a debtor to himself and his copartner, besides being a debtor to others on account of his separate business. Upon becoming insolvent in his individual venture and owing creditors as well as owing his own firm for money advanced to him, the question has arisen as to whether his own firm—the firm of which he was a member and to a portion of the assets of which, including his own debt, he was entitled—could com-

pete or stand on the same footing with his individual cred-
itors in the distribution of his individual assets ; and the
Courts, certainly since the time of LORD THURLOW, who
broke through previous rulings of LORD HARDWICKE,
have quite uniformly held, when the debt to the firm
was not surreptitiously or fraudently created, that until the
individual creditors were first paid in full, the firm of which
the insolvent was a member, though it was also one of his
creditors, could not be permitted to claim satisfaction out of
his individual assets.   There are two conditions under which
the creditor firm of which the insolvent is a member may
prove in competition with the individual creditors ; and
these are : First, where money or effects have been fraudu-
lently abstracted from one estate and applied for the benefit
of the other ; and secondly, where some of the members
of a partnership form an entirely distinct firm carrying on a
distinct trade from that of the general partnership, and
where the *articles* of one trade have been furnished by one
firm to the other.   *Collyer on Part.*, sec. 991.   There was
no fraudulent abstraction of the funds of J. J. Nicholson
and Son by Johns H. R. Nicholson for the benefit of the
Publishing Company.   The overdraft account was made up
of numerous items entered on the firm's books at various
periods, and the transaction as it progressed was known to
the other members of the firm and was never objected to
or challenged.   Much slighter evidence than this will repel
an imputation of fraud.   For instance: Where one partner
puts the other in absolute possession of the partnership
funds and leaves to him the sole management of the con-
cern, this is *prima facie* an implied consent to any measure
which the latter may adopt regarding the joint property ;
and joint creditors must abide by the consequences of such
arrangement.   *Ex parte Assignees of Lodge & Fendall*, 1
Ves. Jr. 166.   The second of the two conditions above
alluded to does not exist in this case.   There were no
articles of trade furnished by Nicholson and Son to Johns
H. R. Nicholson or the Publishing Company.   What was

furnished was money, and LORD ELDON, in *Ex parte Sillitoe*, I Glyn. & Jam. 374, expressly laid down the doctrine that the right of the firm to prove in competition with other creditors arose where *articles of one trade* had been furnished to another trade; and he stated that there was no case in which the proof had been allowed where *money* had been advanced to the partnership by one or more of the partners. This was followed by LORD BROUGHAM in *Ex parte Cook*, I Mont. (*Bankr. cas.*) 228.

The reason for the general doctrine is obvious. If the firm of which the insolvent debtor is a member were allowed to compete with that debtor's individual creditors in the distribution of *his* assets, he would, to the extent of his interest in the firm, be in fact competing with his own creditors and would thereby withdraw from them *for his own benefit* just so much of his own assets as would be necessary to reimburse him his proportion of the very debt due by him personally to himself and his copartners as a firm. In a word he would be repaying himself at the expense of his creditors. That he cannot be permitted to do this is made perfectly clear by LORD ELDON in *Ex parte Harris*, 2 Ves. & B. 210. He said: "There has long been an end of the law which prevailed in the time of LORD HARWICKE, whose opinion appears to have been that, if the joint estate lent money to the separate estate of one partner, or if one partner lent to the joint estate, proof might be made by the one or the other in each case. That has been put an end to, among other principles upon this certainly, that a partner cannot come into competition with separate creditors of his own, nor, as to the joint estate, with the joint creditors. The consequence is, that if one partner lends one thousand pounds to the partnership, they become insolvent in a week, he cannot be a creditor of the partnership, though the money was supplied to the joint estate; so, if the partnership lend to an individual partner, there can be no proof for the joint estate against the separate estate; that is, in each case no proof to affect the creditor, though the individual

partners may certainly have the right against each other."
See *Collyer on Part.*, sec. 990, *et seq.*

Now, if the firm of Nicholson and Son had not failed but
were still solvent, and if Johns H. R. Nicholson alone had
become bankrupt, and if the Baltimore Publishing Company
as a corporation had never existed but the business con-
ducted in its name were confessedly the individual business
of Johns H. R. Nicholson, there can be no possible dispute
that the firm of Nicholson and Son would not, under the
principles alluded to, be permitted to prove this claim for an
overdraft against the separate estate of Johns H. R. Nichol-
son until all his individual creditors were first paid in full.
The insolvency of the firm can in no way alter this legal
principle or affect its application.   Thus in *Ex parte Collinge*,
4 De G. Jones & Sm. 533, Holdsworth and Ashburner
were partners.  The firm became insolvent.   A banking
company was a creditor of Ashburner for one thousand
pounds.   His separate estate amounted to six thousand
pounds.   The assignees of the firm set up a claim against
his separate estate for a debt of eleven thousand pounds due
by him to the firm; and this claim of the assignees of the
firm to compete with the individual creditors of Ashburner
was disallowed.

We have on the record now before us practically the same
situation that was presented in *Ex parte Collinge*, unless the
fact that Johns H. R. Nicholson conducted the business of
the Publishing Company, not in his own name, but in that
of the corporation, distinguishes the two cases.   We do not
pause to discuss the objections made to the validity of the
Publishing Company's charter further than to say we do
not consider them tenable.   And we do not consider them
tenable because the requirements of the general incorpora-
tion law under which the company was formed were " fairly
and substantially complied with."  *Hughes* v. *Antietam Co.*,
34 Md. 324.   But in addition to this the validity of the
articles of incorporation cannot be inquired into incidentally
and collaterally.   *Keene & Brady, Trustees*, v *Van Reuth*,
48 Md. 184.

The testimony clearly and incontestably shows that the whole of the capital stock and the entire assets of the Publishing Company belonged to Johns H. R. Nicholson ; the corporation having been formed merely for convenience in conducting the enterprise. He and everyone else connected with the concern regarded the business as *his* business, and the evidence shows without contradiction that he considered the overdraft now made the basis of Mr. Schmucker's claim, as so much cash contributed to the concern's capital, and not as a debt due by the Publishing Company to the banking house of Nicholson and Son. If this be so, and if it be competent for a Court of Equity to look back of the mere artificial and formal body corporate and upon seeing that Johns H. R. Nicholson was the sole and real owner of its assets and its stock, to treat the debts apparently due by it to the creditors who filled its orders for goods, loaned it money on its notes and supplied it stock in trade, as debts in fact due by Johns H. R. Nicholson on the credit of his ownership of the company's assets, there can be no difficulty in practically applying to this state of facts the legal principles we have been considering in respect to the inability of the trustee of the insolvent firm to compete with the individual creditors of one of its members. We need not go beyond the limits of Maryland for adjudged cases sustaining the right of a creditor or others in an appropriate case and in furtherance of the ends of justice, to treat the debtor corporation and the individual owning all its stock and assets as identical. Thus in *Hoffman Steam Coal Co.* v. *Cumberland Coal and Iron Co.*, 16 Md. 456, it appeared that one Sherman, a director of the Cumberland Company, having purchased lands from it united with other persons in forming a new corporation, he subscribing for almost all the capital stock therein and becoming one of its officers and directors. It further appeared that on the next day, in pursuance of one entire plan, he conveyed the same lands to the new company in payment of his subscription for the stock. Upon a bill filed by the Cumberland Comp an

against Sherman, Dean and the new company, to set aside the deed made by the Cumberland Company to Sherman and Dean, this Court looked through the disguise of a new corporation in which Sherman and Dean had clothed themselves and said: "Sherman and Dean becoming the owners of 4996 of the five thousand shares, into which the capital stock was divided, it was, in fact, but a contrivance whereby the same property was held by the same parties, but under a different name;" and the Court proceeded to deal with the case precisely as though the title to the land had not been conveyed by Sherman and Dean to the Hoffman Company, but still stood in their names. And so in *Swift* v. *Smith, Dixon & Co.*, 65 Md. 428, where one person became the sole owner of all the capital stock of a private corporation and then executed a mortgage upon the corporate property. As a mortgage by the corporation the instrument was defective, but was valid as against the individual who had executed it. This Court looked into the facts and decreed that the mortgage was binding on the corporate property merely because the whole of the capital stock was owned by the person who signed the mortgage. It was said, in effect, that such sole owner might individually make a valid mortgage of all the property of the corporation and that after such a mortgage was recorded it would be binding on all persons thereafter dealing with or trusting the corporation. In both of these cases it was necessary for the Court to look beyond and back of mere external appearances, and upon doing this and discovering that one individual owned the whole capital stock, the transactions dealt with as corporate transactions were treated precisely as they would have been treated had the proceedings been against the individual owning all the stock; not because there was necessarily no difference between any of the ulterior consequences that might arise where there was *no* corporation, and those that might exist where there *was* a corporation the whole of whose assets and stock were owned by one individual; but because the law will not in any case suffer

the corporate name—the mere shadow—to be interposed for the purpose of defeating substantial rights depending for their ultimate vindication not upon the accidental *form* of a transaction, but upon its inherent equity and justice.

Giving heed and credence to the overwhelming and undisputed evidence in the record there is no room to doubt that though the Publishing Company subsisted as a corporation and in its corporate name became ostensibly a debtor to the appellants, it none the less represented the individual business of Johns H. R. Nicholson; and unless we disregard and deliberately depart from the long settled principles to which we have alluded, the creditors whom Johns H. R. Nicholson owes through the agency and under the name of the corporation must be paid first out of the proceeds of the assets individually owned by him and now in the receiver's hands where they rightfully are for distribution, before the trustee in insolvency of Nicholson and Son can make claim to be paid the overdraft out of those same funds, and before the trustee of Johns H. R. Nicholson can demand any part of these funds under the adjudication declaring Johns H. R. Nicholson individually an insolvent.

But it has been strenuously insisted that against this obvious equity of the appellants, the trustee of Nicholson and Son has, as the representatives of the firm's creditors, " a defensive equity " sufficient to neutralize or counterbalance that of the creditors. And this defensive equity is founded on the fact that the creditors of the firm were depositors whose money the banking firm took on deposit when the firm itself was hopelessly insolvent and was known by its members to be so. Upon this state of facts it is contended the depositors were grossly defrauded and that they consequently have the right to follow the funds and reclaim them. Whilst it is true that a bank which, being insolvent and knowing it, takes funds on deposit, thereby commits a gross fraud on the depositors; yet it becomes the duty of the depositor to elect whether he will repudiate the transaction and reclaim the money deposited, or affirming, permit

the relation of debtor and creditor between him and the bank to stand undisturbed. The relation between a bank and its depositors is that of debtor and creditor, and if a fraud has been perpetrated by the bank in accepting the deposit, the depositor may rescind the contractual relation and recover back the money ; but if he affirms the contract he surrenders his right of rescission. Now, all of these depositors have proved their claims in the insolvent proceedings and taken their dividends. They have consequently elected to adhere to the contract and it is too late to rescind it now. These depositors have, therefore, no greater equities than any other contract creditor of Nicholson and Son, and certainly none that is superior to those which the appellants have against the fund realized from the sale of the assets upon the faith of which as being the property of Johns H. R. Nicholson, they credited the Publishing Company.

If the Baltimore Publishing Company was a corporation, and we think it was, then its ostensible assets cannot go into the hands of Nicholson and Son's, trustee in insolvency, or into the hands of Johns H. R. Nicholson's trustee ; but are properly in a Court of Equity for distribution ; and if that Court can, as in a proper case it unquestionably may, look beyond and back of the charter and discover that the assets belong in reality to one individual, then that individual will not, nor will his trustee, be permitted to compete in the distribution of those assets with the creditors of the corporation who are in fact, though not in form, the individual's own creditors ; and, as a consequence, a firm of which that individual is a member will be likewise forbidden to compete with these same individual creditors in respect to that same fund. As such a firm cannot so compete, the trustee of that firm, whether a conventional trustee or a trustee appointed under insolvent proceedings, will occupy no better position (*Houseal and Smith's Appeal*, 45 Pa. St. 484) ; and, therefore, until the creditors who contracted with the corporation on the faith of its assets and in the *bona fide* belief that those assets were owned by Johns H. R. Nicholson individually, are paid in full, the trustee's claim in behalf of the partner-

ship and of the partnership creditors and his claim as trustee of Johns H. R. Nicholson's individual estate must be deferred.

But there is another view of this case presented by the record that ought not to be overlooked. The testimony is unequivocal that Johns H. R. Nicholson, though he entered the items of this over-draft account in the books of the banking house as debits against the Publishing Company, regarded the over-draft not as a debt due by the company to the house of Nicholson and Son, but as cash capital advanced by him to the concern for which he and not the company was a debtor to the firm. He allowed his agents and employees to represent to persons from whom they sought credit for the concern that the only debts due by the company were debts for books and materials purchased, not exceeding fifteen thousand dollars; whilst the assets were stated to be at least one hundred thousand dollars. Upon the faith of these representations which necessarily excluded every inference that there was an indebtedness due to the banking house, the very debts due to the present appellants were contracted. Under these circumstances Johns H. R. Nicholson could not, either as surviving partner or individually compete in the distribution of these assets with the creditors who trusted to, and were influenced by the representations referred to ; and if *he* could not thus compete, it would be inequitable in the extreme to permit the *trustee* to maintain successfully a claim which Nicholson himself would be absolutely estopped to assert. *Devries &c.* v. *Hiss,* 72 Md. 564.

For the reasons we have given the decree appealed from will be reversed and the cause will be remanded for a new decree conforming to the views herein expressed; the costs to be paid out of the funds in Court.

> *Decree reversed and cause remanded,*
> *the costs in this Court and in the*
> *Court below to be paid out of the*
> *funds in the hands of the receivers.*

(Decided January 5th, 1897.)