**William T. WINAND**

v.

**Richard W. CASE, Administrator d.b.n. c.t.a. of the Estate of R. R. Trubey, Deceased, and Birdsboro Steel Foundry & Machine Company.**

Civ. No. 8219.

United States District Court
D. Maryland.

Aug. 26, 1957.

133 F.Supp. 305, 310; United States ex rel. Rosio v. Shaughnessy, D.C.S.D.N.Y. 1954, 134 F.Supp. 217.

Hessey & Herold, John H. Hessey IV, Baltimore, Md., and William T. Winand, Jr., Ruxton, Md., for plaintiff.

Clark, Smith & Prendergast, Clater W. Smith, Baltimore, Md., for defendant Case.

Philander B. Briscoe, Baltimore, Md., for Birdsboro.

R. DORSEY WATKINS, District Judge.

This is a diversity suit instituted April 7, 1955, for damages arising out of an alleged breach of a written contract to employ the plaintiff for life.[1] The plaintiff's cause of action is framed in three alternative ways, the complaint alleging: (1) that the individual defendant's decedent, R. R. Trubey, as equitable sole owner of the Baltimore Enamel & Novelty Company (Baltimore Enamel), one of the present corporate defendant's predecessor corporations, acted for and on behalf of said predecessor corporation and executed a binding contract of employment between the plaintiff and Baltimore Enamel, which contract was wrongfully breached by the original defendant successor corporation; or (2) that R. R. Trubey entered into an agreement between himself and the plaintiff wherein Trubey bound himself to provide lifetime employment for the plaintiff either

---

[1] The duration of the employment as set forth in the alleged contract has been variously referred to by the plaintiff as a "contract of *continued* employment" (counts one and three of plaintiff's complaint); "a contract of *permanent* or *lifetime* employment" (p. 2–1 of plaintiff's brief); a contract of employment "for life or *until retirement*" (p. 3–2 of plaintiff's brief); or a contract of employment "for life or *until normal retirement*" (p. 1 of plaintiff's proffer of testimony). (Emphasis supplied.) The court will refer to the contract solely as one of employment for life.

personally or by causing the original defendant corporation or its predecessor to enter into a formal contract of employment, which undertaking was breached by Trubey's failure to perform; or (3) that R. R. Trubey entered into an agreement with the plaintiff which was both a personal contract and a contract of Baltimore Enamel, to be performed jointly by both Trubey and the said corporation, and that the original defendant corporation's discharge of the plaintiff constituted a breach by both Trubey and the original defendant[2] corporation. After the filing of answers, the filing of interrogatories and answers thereto by both sides, the taking of depositions by both sides, and the plaintiff's request for the admission of certain facts and the genuineness of certain documents,[3] both the individual defendant and the corporate defendant moved pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., for summary judgment.

As grounds for the motion for summary judgment the individual defendant alleges that no contract of employment ever existed between Trubey and the plaintiff; that no contract of lifetime employment ever existed between Trubey and the plaintiff or the defendant corporation and the plaintiff; and that the action is barred by the Maryland Statute of Limitations. The corporate defendant asserts as its grounds in addition to limitations and failure to comply with the Statute of Frauds that it never executed or agreed to be bound by the alleged agreement; that there was no consideration to it for the agreement; that the agreement would have been an unauthorized and illegal exercise of corporate powers; that the plaintiff voluntarily left and refused to continue employment with the defendant corporation;[4] that the agreement, if such existed, was not for lifetime employment; and that the defendant corporation never entered into a contract for lifetime employment with the plaintiff or any other employee.

The following facts are not in dispute.

On June 9, 1944, R. R. Trubey over the signature of Clyde Porcelain Steel Corp. (Clyde), and indicating that he was acting on behalf of that corporation as its president, addressed a letter to the stockholders of Baltimore Enamel proposing to do the following:

"Having reference to your March 31, 1944 balance sheet and operating statement, and subsequent representations made by your officers as to operations during April and May, 1944, and your desire to secure management and additional working capital, we propose the following.

"1. We will furnish at least $100,000 additional working capital on as secure a basis to us as possible.

"2. Your present common stock holders will agree to exchange their entire holdings, in a manner most advantageous taxwise to all concerned, into $200,000 worth of 6 per cent cumulative preferred stock; it is agreeable to us that a provision will be incorporated in the preferred stock that the fixed assets of the Company will not be further en-

---

2. Since the bringing of this suit, the original corporate defendant, Universal Major Elec. Appliances, Inc., has merged into Birdsboro Steel Foundry & Machine Company, the latter corporation thereupon being substituted for the former as a party-defendant. No further distinction need be made in this opinion between the original and present corporate defendants.

3. The matters regarding which admissions were requested are admitted, the de-

fendants having failed to deny, or object to, the request for admissions within the period provided (Rule 36(a) F.R. C.P.).

4. There is a very real question on the entire record as to whether plaintiff resigned, and if so whether voluntarily or under pressure, or whether he was discharged. For the purpose of defendants' motions for summary judgment, it will be assumed that plaintiff was discharged.

cumbered without the consent of the preferred stock holders; it is also agreeable to us that the first year's dividends of $12,000 will be guaranteed to be paid within one year from the time we acquire control. Any other reasonable provisions for the protection of preferred stock holders will be agreeable to us.

"3. *It will be desirable to us that your* present president, Mr. Henry A. Brehm, become Chairman of the Board and be paid a salary of $2,500 per year so long as the operations justify; also that Mr. H. B. Little may either remain active in the business at his present or a reduced, salary, to be mutually agreed upon, or he may retire on a pension or income of not less than $100 per month and not more than $250 per month; that one of our organization will become President of the Company and will be the directing head; that George Blome will remain as Vice-President in charge of sales, subject to our direction; *that William Winant* [*sic*] *will become Vice-President and will execute such duties as may be required of him by the President; that the salaries being paid William Winant* [*sic*] *and George Blome will remain the same as they are now so long as they properly carry out their duties as determined by the new President and his associates; it is also our desire to have both William Winant* [*sic*] *and George Blome remain active in the business indefinitely, and it is our intention that, if they show the ability and application required to make the business successful under reasonable direction of our organization, they shall have a reasonable amount of the new common stock,* which will be issued exclusively to members of our organization, and distributed among those individuals who contribute materially to the success of this new set-up or company." (Emphasis supplied.)

On June 16, 1944, the stockholders' attorney wrote Mr. Trubey in care of Clyde requesting clarification of certain details of the offer to which Mr. Trubey responded on June 22, 1944, again signing as president of Clyde. On July 5, 1944, the stockholders' attorney, having been advised of a proposed conference of stockholders to consider Trubey's proposal, wrote the plaintiff who at that time, although not a stockholder, was the Secretary, Treasurer and General Manager of Baltimore Enamel receiving a salary of $8,840 per annum, in part as follows:

"As the matter now stands, it would seem to me that the situation with respect to the claims above referred to [a contingent liability of Baltimore Enamel known as the "smoke pipe claims"] must constitute a highly important consideration in the mind of Mr. Trubey and that you are not free to look on Mr. Trubey's letter of June 9th as constituting a firm continuing offer subject now to acceptance or rejection by the stockholders.

"About the best you can do at the meeting on Friday would be to pass a resolution accepting, in principle, the proposition discussed in Mr. Trubey's letter of June 9th, Mr. Cook's reply of June 16th, and Mr. Trubey's letter of June 22nd, and conferring authority upon a committee of the stockholders to negotiate with respect thereto."

The conference of stockholders was held on July 7, 1944, and the minutes of that meeting end:

"RESOLVED that the stockholders present in person and by proxy representing approximately 95% of the total outstanding stock of the company, do hereby accept in principle the proposition presented in Mr. Trubey's letter of June 9,th Mr. Cook's (the company's attorney) letter of June 16th and Mr. Trubey's reply of June 22nd to Mr. Cook.

"IT WAS FURTHER RESOLVED that authority is hereby conferred upon a committee consist-

ing of H. B. Little, W. T. Winand and G. S. Blome, to negotiate with respect to Mr. Trubey's proposal of June 9th and that the firm of Cook & Markell is appointed to act as counsel to the committee."

Subsequent to July 7, 1944, and on or before July 18, 1944, the plaintiff became the owner of approximately two and one-tenth per cent of the common stock of Baltimore Enamel. On July 18, 1944, the stockholders of Baltimore Enamel, including the plaintiff wrote to Trubey, individually and not as president of Clyde, stating:

"The undersigned, owners of common stock of Baltimore Enamel & Novelty Company, offer to sell their stock to you for the sum of $500, provided

"(1) you will cause Baltimore Enamel & Novelty Company to issue its capital notes proportionately to each present owner for the total sum of $200,000, payable on or before 10 years from date, with interest at 6%,

"(2) that on the date of transfer of the stock to you, you will cause Clyde Porcelain Steel Corporation to lend to the Baltimore Enamel & Novelty Company $100,000 on collateral, consisting of unpledged receivables,

"(3) that all details contained in the memorandum of Tentative Proposed Plan *between R. R. Trubey and the Stockholders* of Baltimore Enamel & Novelty Company, dated July 13, 1944, shall be considered as incorporated in this offer, including particularly the provision covering smoke pipe claims. (Emphasis supplied.)

"(4) that this offer shall be accepted or rejected by you on or before August 1, 1944, during which time your auditor shall have full access to examine the Company's latest statements, and

"(5) that this offer shall be subject to flat acceptance or flat rejection."

The memorandum of July 13, 1944, incorporated by reference in the offer, again recited that Trubey would cause Clyde to make the loan to Baltimore Enamel and, in addition to various other provisions, that Trubey would individually guarantee for the first year the payment of the 6% interest on the notes totaling $200,000. No reference was made, in either the stockholders' offer or in the therein incorporated memorandum, to paragraph three of the letter of June 9, 1944, relative to the plaintiff's employment. On July 18, 1944, by acceptance of the stockholders' offer Trubey became the sole equitable owner of all the issued and outstanding capital stock of Baltimore Enamel and acquired subsequent thereto but during 1944 legal ownership as well. On the same day that the offer was made and accepted, Trubey addressed a communication to Mr. Brehm, Mr. Little, Mr. Blome and the plaintiff, stating:

"With respect to the offer made to me on this date by the stockholders of The Baltimore Enamel and Novelty Company, I am writing to say that, if I accept that offer by August 1, 1944, then I will carry out, in letter and in spirit, the undertakings proposed by me in Paragraph 3 in the letter of June 9th, 1944, of Clyde Porcelain Steel Corporation, addressed to the stockholders of The Baltimore Enamel and Novelty Company and signed by me as president of that Company."

Thereafter Baltimore Enamel issued its capital notes, proportionately to each owner of common stock as of record on July 18, 1944, in the total amount of Two Hundred Thousand Dollars, and the plaintiff received in August or September 1944 approximately Four Thousand Two Hundred Dollars worth of said notes. On August 1, 1944, the plaintiff was made Secretary and Vice President in charge of production of Baltimore Enamel at a salary of $8,840 per year. As such the plaintiff was the top operating officer of the corporation in charge of all manufacturing operations. In Sep-

tember 1944 Baltimore Enamel accepted a loan of $100,000 with interest at three per cent from the Maryland Trust Company and assigned its unpledged receivables in the amount of $100,000 as security therefor. On March 1, 1945, Trubey wrote the plaintiff on the letterhead of Clyde, in part:

"In accordance with our agreement, I am this date selling you 90 shares of the present common stock of The Baltimore Enamel and Novelty Company at $1.00 per share."

The letter gave the plaintiff an option to purchase a similar additional amount within three years and contained an agreement between Trubey and the plaintiff providing that Trubey should have the option to repurchase the said ninety shares within one year, no right being reserved on the part of Trubey to repurchase any additional shares acquired by the plaintiff should the plaintiff exercise his option to purchase a similar additional amount within three years. Simultaneously with the issuance of the stock the plaintiff endorsed it to Trubey who then retained the shares as collateral for his option to repurchase. On March 1, 1946, upon termination of the repurchase option, Trubey returned the shares to the plaintiff exchanging 1440 shares of Baltimore Porcelain for the 90 shares of Baltimore Enamel, the name of Baltimore Enamel having been changed prior thereto on March 29, 1945, to Baltimore Porcelain Steel Corporation. On July 1, 1945, the plaintiff had become Secretary and Vice President in charge of finance of the Baltimore Porcelain Steel Corporation, his duties being to supervise office procedure and to arrange credit, collections, and loans. On March 1, 1952, Baltimore Porcelain Steel Corporation and Artcraft Manufacturing Corporation merged into Universal Major Elec. Appliances, Inc. (Universal), and the plaintiff was made Assistant Secretary of Universal with duties generally associated with the office of credit manager. On March 8, 1953, R. R. Trubey died, and on March 13, 1953, the plaintiff received oral notice that his services would be discontinued as of April 17, 1953, because Universal's administrative offices were being moved for purposes of economy to Lima, Ohio. The plaintiff received full pay through May 17, 1953 and half pay until July 1953.

From 1945 until the termination of his services the plaintiff's salary had never been less than $8,840 per annum and was in April of 1953, $11,700 per annum. Since the bringing of this suit on April 7, 1955, Universal which admittedly had assumed the liabilities, debts, and contracts of its predecessor corporations, has merged into Birdsboro Steel Foundry & Machine Company (Birdsboro) and Birdsboro has been substituted as the corporate defendant.

Following oral argument on the defendants' motions for summary judgment, plaintiff's counsel advised the court, in part, as follows:

"The Plaintiff has stated his cause of action against Richard W. Case, Administrator d.b.n.c.t.a. of the Estate of R. R. Trubey in the alternative as follows:

"1.) That either R. R. Trubey contracted personally to employ Plaintiff, or,

"2.) That R. R. Trubey contracted to cause the Corporate Defendant to employ Plaintiff.

\* \* \* \* \* \*

"Based on an examination of the law, the Plaintiff feels that if Mr. Trubey personally contracted to employ Plaintiff, under the specific contract, that liability against Mr. Trubey terminated with his death. Accordingly Plaintiff feels it unnecessary to file a supplemental memorandum."

This, in effect, constitutes a motion by the plaintiff to dismiss the action asserted in portions[5] of both counts two and

---

5. Those portions to which the court has reference are, as italicized: Count

II—"*That the said R. R. Trubey failed to provide the employment provided*

three. The court pursuant to Rule 41 (a)(2) of the Federal Rules of Civil Procedure grants the motion.

 The remaining cause of action against the individual defendant, being in the alternative to the cause of action against the corporate defendant and depending for its success upon a finding that the plaintiff has no binding contract of employment for life with the corporate defendant, is barred by the Statute of Limitations, suit not having been instituted until April 7, 1955. Section 1 of Article 57 of the Code of Public General Laws of Maryland, 1951 Edition, provides:

"All * * * actions of assumpsit, * * * except as hereinafter provided, actions of debt on simple contract, * * * shall be commenced, sued or issued within three years from the time the cause of action accrued; * * *."

In Vincent v. Palmer, 1941, 179 Md. 365, 374, 19 A.2d 183, 189, the Maryland Court of Appeals said in discussing Article 57, Section 1, "* * * the statute begins to operate at the time the cause of action becomes vested and enforceable, not from the time of the making of the promise. Murdock v. Winter's Admr., 1 H. & G. 471, 473." The plaintiff's cause of action, if any, against the individual defendant, arose upon Trubey's failure to cause Baltimore Enamel to enter into a contract to employ the plaintiff for life. "An unexcused failure to perform a contract is a legal wrong. Action will lie for the breach although it causes no injury. Nominal damages are then awarded." (5 Williston on Contracts, Revised Edition, Section 1339A,

p. 3766; accord: Duplex Envelope Company, Inc., v. Baltimore Post Company, 1933, 163 Md. 596, 606, 163 A. 688; Wlodarek v. Thrift, 1940, 178 Md. 453, 461, 13 A.2d 774; see also: Hahn v. Claybrook, 1917, 130 Md. 179, 182–183, 100 A. 83, L.R.A.1917C, 1169). All facts indicate that the alleged failure to perform occurred on August 1, 1944. Trubey's communication of July 18, 1944, stated, inter alia, "if I accept that offer by August 1, 1944, *then* I will carry out * * * the undertaking proposed by me * * *." (Emphasis supplied.) "Then", of course, may be defined as meaning " 'at that time' ", "soon afterwards", "immediately" or as having no reference to time and meaning rather "in that case". 86 C.J.S. Then pp. 770–772.

"The word in fact will bear two meanings, as its use shows it to be either a conjunction [employed as a word of condition] or an adverb [of time]." National Sewing-Machine Company v. Willcox & Gibbs Sewing-Machine Co., 3 Cir., 1896, 74 F. 557, 559.

It is significant that by August 1, 1944, Trubey had become the sole contract owner of all the stock of Baltimore Enamel[6] and thus, according to plaintiff's theory, was in a position to perform, and that on August 1, 1944, the plaintiff was, in fact, promoted from Secretary, Treasurer and General Manager to Secretary and Vice President in charge of production, thus functioning as the top operating officer of Baltimore Enamel and being in charge of all manufacturing operations.[7] To this extent on August 1, 1944, the undertaking of paragraph three of the letter of June 9, 1944,

---

for the Plaintiff in the above recited contract, either *personally* or by causing the Defendant Corporation herein or its predecessor corporation to enter into a formal contract of employment, and thereby breached said contract." Count III—"* * *, *that said contract was intended by the said R. R. Trubey* both *as a personal contract* and as the contract of The Baltimore Enamel and Novelty Company, * * *." To the

extent that the italicized portion of the Third Count can be construed as alleging a personal undertaking by Trubey to cause Baltimore Enamel or Universal to enter into a formal contract of employment, of course, the plaintiff's cause of action is reserved.

6. Plaintiff's request 2(b) for admission of fact.

7. Plaintiff's answers to interrogatories 1–A and 1–B.

had been carried out or breached. If more were required, the plaintiff was entitled to enforce his rights as of that date, but even if the reasoning of the plaintiff were accepted that the alleged contract was silent as to the time of performance, therefore affording Trubey a reasonable time in which to cause Baltimore Enamel to employ the plaintiff for life, the conclusion reached would be no different.

According to plaintiff's own "chronology of admitted facts",[8] after the plaintiff's acceptance of his new position as Vice President on August 1, 1944 and more than three years prior to the bringing of this suit, the following occurred:

"March 29, 1945—Name of Baltimore Enamel & Novelty Co. changed to Baltimore Porcelain Steel Corporation.

"July 1, 1945 —Plaintiff became Secretary and Vice-President in charge of Finance of Baltimore Porcelain Steel Corporation, duties being to supervise office procedure and to arrange credit and collections and arrange for loans.

"January 2, 1952— Universal Major Elec. Appliances, Inc. formed as a Delaware corporation.

"March 1, 1952 —Baltimore Porcelain Steel Corporation and Artcraft Manufacturing Corporation merged into Universal Major Elec. Appliances, Inc.

"March 1, 1952 —Plaintiff made Assistant Secretary of Universal Major Elec. Appliances, Inc. with duties generally associated with office of assistant secretary (together with other duties previously assigned) * *"

Yet during this entire period of over seven and one half years from the making of the alleged promise on July 18, 1944, to the demotion of the plaintiff to Assistant Secretary on March 1, 1952, plaintiff did nothing to enforce his alleged contractual rights. Plaintiff explains by saying his relationship with Trubey was "one not calculated to make him press the matter of entering into a formal contract, particularily [sic] when consideration is given to the fact that the Plaintiff thought he already had such a contract."[9]

What constituted a reasonable time is in the instant case a matter for determination by the court (Nunez v. Dautel, 1873, 19 Wall. 560, 563, 86 U.S. 560, 563, 22 L.Ed. 161; Ragan v. Gaither, 1841, 11 Gill & J., Md., 472, 490; North Brothers & Strauss v. Mallory, 1902, 94 Md. 305, 318, 51 A. 89). The court finds as a fact and rules as a matter of law that, even if Trubey had a reasonable time in which to perform, a period of seven and one-half years constituted more than a reasonable time under the circumstances herein, and therefore a breach of any alleged contract with the plaintiff, and that the plaintiff's suit is barred by limitations, he having failed to bring his action within three years from the time such cause of action accrued. As to the plaintiff's allegation that he thought he had a contract of employment for life with Baltimore Enamel, the plaintiff's ignorance of his rights does not defeat the bar of the Statute of Limitations (Abell v. Harris, 1841, 11 Gill & J., Md., 367, 372). Although no fraud on the part of Trubey has been intimated, much less alleged, plaintiff would, even in the face of a fraudulent concealment by Trubey of his failure to perform, have to show usual or ordinary diligence to discover his cause of action, an insurmountable burden for the plaintiff in the instant case

---

**8.** Chronology of Admitted Facts, p. 2.

**9.** Plaintiff's brief, p. 1–2.

considering the knowledge that he must have had of corporate affairs both as a stockholder and as an officer of the corporation. (Art. 57, Sec. 14, Code of Public General Laws of Maryland, 1951 Edition).

■ This leaves then as the sole issue the question of whether or not the plaintiff had a valid, binding contract of employment for life with the defendant corporation, or its predecessor corporations. The plaintiff contends that four documents (1) the offer of June 9, 1944, (2) the counter-offer of July 18, 1944, incorporating, (3) the memorandum of July 13, 1944, and (4) Trubey's letter of July 18, 1944, "when integrated", constitute his contract of employment. It is apparent from the face of these writings that they can not be integrated. The original offer of June 9, 1944, was made by Trubey as president of Clyde to all of the stockholders of Baltimore Enamel and the undertakings proposed therein were couched in terms of "we propose", "we will furnish", and "it will be desirable to us". The stockholders on advice of counsel did not consider this an offer subject to acceptance or rejection, even although the offer had been somewhat clarified and more sharply defined by the interim correspondence of June 16th and June 22, 1944, and, accordingly, all of the stockholders made on July 18, 1944, a counter-offer to Trubey individually which was subject to a flat acceptance or rejection and which, if accepted, bound him to such personal undertakings as the purchase of all of the stock of Baltimore Enamel and the guarantee of the payment of the first year's interest on the notes to be issued, and also to cause Baltimore Enamel and Clyde to do certain corporate acts. The plaintiff's contention that, thereafter, by unilateral action on the part of Trubey in making an offer of employment, which offer was uncommunicated to, and hence not accepted by all of the stockholders of Baltimore Enamel, the proposal in paragraph three of the letter of June 9, 1944, was incorporated into the agreement between Trubey and said stockholders is not sup-

ported by the law, or the facts of this case. That any attempt by Trubey to modify, or add to, the offer made to him would have constituted a rejection by him of that offer is so basic to the law of contracts that no authority need be cited and, as a matter of fact, the offer itself so stated. Trubey accepted the offer unconditionally by writing across the face of the letter making the offer over his signature "I hereby accept the above proposal."

That the four documents in question can not be integrated is further evidenced by the fact that Trubey's communication of July 18, 1944, was not addressed to all of the stockholders of Baltimore Enamel but rather only to the individuals previously mentioned in paragraph three of the letter of June 9, 1944, namely, Mr. Brehm, Mr. Little, Mr. Blome and the plaintiff, persons whom the plaintiff has consistently referred to as constituting the stockholders' committee; but the minutes of the conference of the stockholders held on July 7, 1944, clearly indicate that Mr. Brehm was not a member of that committee and that the purpose of, and authority conferred on, that committee was to negotiate the terms of the final agreement. By July 18, 1944, negotiation was over and a firm offer had been made on the part of the stockholders. As evidencing a written contract of employment the plaintiff must rely solely on Trubey's communication of July 18, 1944, incorporating by reference the undertakings proposed in paragraph three of the letter of June 9, 1944.

■ Assuming for the moment that these two writings constituted an offer to the plaintiff by Trubey of employment for life and that the plaintiff merely by continuing in, and failing to resign from, the employ of a company with which he had previously been associated for twenty-two years evidenced an acceptance of this offer, the plaintiff still can not recover unless he can go further. When "an employee of a corporation claims that he has been employed on a lifetime basis, he must show either (1) that the officer who made the con-

tract of employment acted on behalf of the corporation with authority for that purpose, or (2) that the contract was ratified by the corporation or its fruits were accepted with full knowledge of the circumstances of their acquisition. Heaman v. E. N. Rowell Co., 261 N.Y. 229, 185 N.E. 83; General Paint Corporation v. Kramer, 10 Cir., 57 F.2d 698, 703; 2 Fletcher, Private Corporations, Perm. Ed., sec. 677." Chesapeake & Potomac Telephone Co. of Baltimore City v. Murray, 1951, 198 Md. 526, 531, 84 A.2d 870, 872.

 The plaintiff does not contend that the by-laws and corporate records of Baltimore Enamel show any ratification, adoption or acceptance of the contract, or that the Board of Directors ever took any action of any nature to adopt any contract with the plaintiff. The plaintiff rather seeks to come within the test laid down in the Chesapeake & Potomac Telephone Co. case, supra, by alleging[10] that Baltimore Enamel "accepted said contract and the fruits flowing therefrom (the One Hundred Thousand Dollar ($100,000.00) loan at three percent (3%) ) at a time when the corporation's officers and directors were fully aware of the provisions running in favor of the Plaintiff. Even more important,[11] the execution of the agreement by Trubey at a time when he was equitable sole-owner of all the stock of the corporation, was binding on the corporation, it being his intention to so bind the corporation." This court has already ruled that the One Hundred Thousand Dollar loan to Baltimore Enamel was the result of, and a provision of, the contract between Trubey and all of the stockholders of Balti-

more Enamel. After the contract between Trubey and all of the stockholders came into existence, some of the officers and directors of Baltimore Enamel, whose knowledge of the provisions of the alleged agreement between Trubey and the plaintiff, among others, it is argued bound the corporation, were the very parties to that agreement in whose favor it ran—Mr. Brehm as Chairman of the Board; Mr. Blome as director and Vice-President; and the plaintiff as director, Secretary and Vice-President. This is scarcely the type of acceptance with full knowledge that was envisaged by the court in Chesapeake & Potomac Telephone Co. of Baltimore City v. Murray, supra. The plaintiff's second contention that Trubey as sole owner could, intended to, and did, bind Baltimore Enamel places the plaintiff in the dilemma of asking this court to pierce the corporate veil at the time of Trubey's acceptance of the stockholders' offer and thus consider the execution of a subsequent agreement by him at a time when he was the equitable sole owner of all of the stock of the corporation as binding, and intended to bind, the corporation; and then asking the court to reinstate the corporate identity of Baltimore Enamel and to construe Trubey's procurement of the loan granted (by Maryland Trust, not Clyde) to the corporation of which he was sole owner as constituting consideration to the corporation to support its promise or undertaking to hire the plaintiff for life. Were the plaintiff's theory that the court should not regard Trubey and Baltimore Enamel as independent persons consist-

---

10. Plaintiff's brief, p. 4–1.

11. To support this second contention the plaintiff quotes from Potts v. Schmucker, 1897, 84 Md. 535, 553, 36 A. 592, 596, 35 L.R.A. 392:
 " * * * discovering that one individual owned the whole capital stock, the transactions dealt with as corporate transactions were treated precisely as they would have been treated had the proceedings been against the individual owning all the stock; not because there was necessarily no difference between any

of the ulterior consequences that might arise where there was *no* corporation, and those that might exist where there *was* a corporation the whole of whose assets and stock were owned by one individual; but because the law will not in any case suffer the corporate name—the mere shadow—to be interposed for the purpose of defeating substantial rights depending for their ultimate vindication not upon the accidental *form* of a transaction, but upon its inherent equity and justice."

ently followed, then the procurement of the loan by Trubey and the acceptance of the loan by Baltimore Enamel (Trubey's alter ego) could hardly constitute consideration for Trubey's and/or Baltimore Enamel's undertaking to employ the plaintiff for life. This court sees no reason to fail to follow the general rule that a corporation, even if owned solely by one person, will be regarded as an independent person distinct from its shareholders subject to exception only when necessary to prevent fraud or to enforce a paramount equity. Brune on Maryland Corporation Law, Revised Edition, Sections 371–372, pp. 433–440.

Moreover plaintiff's contention that the *execution of the agreement of employment* by Trubey at a time when he was equitable sole-owner of Baltimore Enamel bound that corporation is so damaging to the plaintiff's cause of action as to destroy it completely. This allegation can only be interpreted as meaning that Trubey first accepted the stockholders' offer of July 18, 1944, for the sale to him of all of the stock of Baltimore Enamel and that thereafter having become by such acceptance equitable sole owner, he made his offer of employment to the plaintiff and others.[12] The plaintiff's chronology of admitted facts so states:

"4. July 18, 1944–Acceptance of offer of stockholders by R. R. Trubey

"5. July 18, 1944–Letter by Trubey to stockholders committee stating that Trubey will undertake to carry out the provisions of #3 of letter dated June 9th relating to employment of Winand and others."

12. The court does not agree with the plaintiff's position as to the time element. The phrase "the execution of the agreement" has consistently been used by the plaintiff to mean the preparing, signing, and delivery of Trubey's letter of July 18, 1944 to Mr. Brehm, Mr. Little, Mr. Blome and the plaintiff. That the plaintiff has never used the phrase to indicate performance, or partial performance, after the formal execution of the alleged contract is evidenced by such allegations in the complaint as:

"That all of the parties hereto or their predecessors, *after the execution of said agreement,* relied on the same, and the following actions were taken pursuant to said agreement:

"A. The Baltimore Enamel and Novelty Company issued its capital notes proportionately to each of the old stockholders of the Corporation for the total sum of Two Hundred Thousand Dollars ($200,000.00), payable on or before ten years from date with interest at six-percent (6%) per annum.

"B. Clyde Porcelain Steel Corporation loaned to Baltimore Enamel and Novelty Company the amount of One Hundred Thousand Dollars ($100,000.00) on collateral of unpledged receivables, with interest at the rate of three-percent (3%) per annum.

"C. All of the other terms and conditions of said agreement listed under paragraph A on page 2 of this declaration were *abided by and performed by each and all of the parties* to said agreement.

"D. The Plaintiff, William T. Winand, assumed his duties as Vice-President of said Corporation in accordance with the terms of said contract, and from that time until April 17, 1953, the Plaintiff *diligently and faithfully performed* all of the work and duties required of him under said contract of employment.

"E. That during the period of time from July 27, 1944 to April 17, 1953 The Baltimore Enamel and Novelty Company complied with the provisions of said contract with respect to the issuance of a reasonable amount of new common stock of said corporation to the Plaintiff, William T. Winand." Count I of plaintiff's complaint, p. 4; Count III of plaintiff's complaint, pp. 9–10. (Emphasis supplied.)

Trubey's letter stating "if I accept that offer by August 1, 1944" (the stockholders' offer to sell) clearly shows, on its face, that no binding contract yet existed relative to the sale and purchase of the stock of Baltimore Enamel and that, accordingly, the alleged agreement of employment was executed by Trubey at a time when he was not the

If this be true, then the plaintiff's offer of his two and one-tenth percent interest in the stock of Baltimore Enamel did not constitute the consideration[13] for the so called agreement between himself and Trubey, as originally alleged in the complaint, the purchase of the stock having been consummated prior to Trubey's subsequent, and, therefore, gratuitous, offer of employment. As further consideration the plaintiff asserted in his complaint the doctrine of detrimental reliance in that "at the time the said contract was made, the Plaintiff, being then but forty-nine years of age, could have sought employment elsewhere, but decided not to do so in view of the said contract of continued employment, and thereby the Plaintiff's reliance upon said contract and the validity thereof, should the same be uninforceable [sic] by him for want of consideration at the time of its inception, would cause him great and serious damage." This last contention is quickly answered by a quotation from Chesapeake & Potomac Telephone Co. of Baltimore City v. Murray, supra, 198 Md. at page 533, 84 A.2d at page 873, wherein the Maryland Court of Appeals said:

"However, the mere giving up of a job, business or profession by one who decides to accept a contract for alleged life employment is but an incident necessary on his part to place himself in a position to accept and perform the contract, and is not consideration for a contract of life employment. Adolph v. Cookware Co. of America, 283 Mich. 561, 278 N.W. 687, 689; Edwards v. Kentucky Utilities Co., 286 Ky. 341, 150 S.W.2d 916, 135 A.L.R. 642."

The plaintiff, accordingly, finds himself in the position of being unable to show consideration if his theory as to ratification or acceptance by the corporation is followed and, on the other hand, unable to show ratification or acceptance by the corporation[14] if his theory as to consideration is correct.

The aforegoing conclusions aside, the plaintiff still, as a matter of law, could not recover. The wording of the letter of June 9, 1944, and in particular the wording of paragraph 3 therein, are subject to the criticism advanced by Judge Parker in Lucas v. Federal Reserve Bank of Richmond, 4 Cir., 1932, 59 F.2d 617, 619:

"It is clear that the first cause of action states no ground of relief either in contract or in tort. The

---

contract or equitable sole owner of Baltimore Enamel and thus was not in a position to bind Baltimore Enamel. Such a conclusion is likewise dictated by plaintiff's contradictory "Chronology of Admitted Facts" where in outlining the events occurring on July 18, 1944, the plaintiff lists in sequence the offer to sell, the acceptance, Trubey's offer of employment to the plaintiff, and then adds: "6. July 18, 1944—Baltimore Enamel & Novelty Co. issued $200,000, 6%, 10 year notes to stockholders as agreed and R. R. Trubey became owner of all capital stock of Company."

13. As indicative of the fact that plaintiff's stock did not constitute consideration for Trubey's offer of employment it should be remembered that, when the offer of employment was originally made on June 9, 1944, the plaintiff was not a stockholder and that, after becoming a stockholder, plaintiff together with all of the other stockholders of Baltimore Enamel offered, subject to flat acceptance or rejection, to sell his stock to Trubey, which offer was not predicated upon the employment of the plaintiff for life or for any other period of time.

14. All of Trubey's communications to plaintiff, both before and after Trubey became sole owner and president of Baltimore Enamel, are expressed in terms appropriate to one acting in a personal, individual capacity as distinguished from one purporting to act for, or as a representative of, a corporation. "* * I will carry out * * *" (letter of July 18, 1944); "In accordance with our agreement, I am this date selling you 90 shares * * *" (letter of March 1, 1945); "Referring to our Memorandum of Agreement * * * I am pleased to enclose * * * Certificate No. * * * and agree that the conditions * * * have been complied with." (letter of March 1, 1946). All were signed R. R. Trubey with no representative

allegation that the Reserve Bank promised to 'extend such additional accommodations in the way of discounts as would be necessary to meet the additional burden assumed' sets forth none of the essential terms of a contract. It does not show the amount of credit to be extended, *the period of the credit,* the *amount or kind of security* to be deposited as collateral, or *the interest to be paid.* The court cannot see by reading it any definite agreement which the law could enforce. In the language of Mr. Justice Holmes, 'On the face of it, it does not import a legally binding promise, but rather a hopeful encouragement, sounding only in prophecy.' Hall v. First Nat. Bank of Chelsea, 173 Mass. 16, 53 N.E. 154, 155, 44 L.R.A. 319, 73 Am.St.

Rep. 255. It is well settled that such a vague promise does not constitute a binding and enforceable contract." (Emphasis supplied.)[15] Directly on point is Baltimore & Ohio Railroad Co. v. King, 1935, 168 Md. 142, 148–149, 176 A. 626, 628, wherein the court, in attempting to construe the terms of an alleged oral contract of employment for life, said:

"In the case of Heckler v. Balto. & O. R. Co., 167 Md. 226, 173 A. 12, the court, on a demurrer to a declaration, found that an alleged contract in substantially the same terms was unenforceable for lack of definiteness, in that neither the work to be furnished nor the wages to be paid were specified in it. In that case the undertaking alleged was that the plaintiff would be given

capacity noted and the letters of March 1945 and 1946 were on the letterhead of Clyde Porcelain Steel Corporation. All of these documents negate an intention to act for or bind Baltimore Enamel.

15. It is interesting in this connection to compare Judge Parker's statement with a portion of the letter written by the stockholders' attorney on June 16, 1944, to Trubey:
"My clients, the controlling stockholders in the Baltimore Enamel & Novelty Company, have discussed with me your letter of June 9 and have asked me to reply to the same. There are some matters in your letter which are not entirely clear to me and as to which I should like to have a further explanation.
"One: With regard to the $100,000. additional working capital. *I assume this is to be a loan,* but would like to know *how long it is to run, what rate of interest* it is to bear and *what security* you intend to require for the same. (Emphasis supplied.)
"Two: My clients feel that there should be a provision in the agreement that no salaries will be paid to you or your associates until after profits sufficient for the preferred stock dividends are made.
 * * * * *
"Four: There should be some provision in the agreement as to the retirement of the preferred stock. What is your suggestion on this point?
"Five: There should be provision that

there is not to be any issue of bonds or other securities which will take precedence over the preferred stock."
In effect, the stockholders' attorney was saying that the most important undertakings of the proposal, the offer to supply additional working capital (paragraph one of the letter of June 9, 1944) and the provisions relating to the protection of the preferred stockholders (paragraph two of the letter of June 9, 1944) were not expressed in terms definite enough to constitute an enforceable agreement. A fortiori, the mere indication of the desirability of certain persons remaining in the employ of Baltimore Enamel (paragraph three of said letter) was at the most "a hopeful encouragement sounding only in prophecy". The wording of paragraph Three taken as a whole, without limiting the analysis thereof to those portions referring solely to the plaintiff, dictates such a conclusion, the language used being "so long as the operations justify"; "may either remain active * * * at * * present, or a reduced, salary, to be mutually agreed upon, or * * * may retire on a pension or income of not less than $100 per month and not more than $250 per month;" "will remain as Vice-President in charge of sales, subject to our direction;" "will execute such duties as may be required of him by the President"; and " * * * salaries * * * will remain the same as they are now so long as they [plaintiff and Blome] properly carry out their duties as determined by the new President * * *."

steady employment during his life, or so long as he was able to do work of any kind about the shops or railroad, and in the present case the testimony was that the plaintiff was to be given a job for life, that the company's officer or agent said there was something he could have at Baltimore or at Washington, as switchman, lots of jobs. The plaintiff's counsel, in argument, construes this to have been an undertaking that the plaintiff should be employed as switchman during his life, but the court disagrees, and thinks the words do not permit that restriction of the employment. The plaintiff himself apparently did not regard the job of watchman at Rockville as a departure from an agreement,[16] nor did he, according to his testimony, object that the job of button pushing, offered and refused by him, was excluded by anything other than his nervous condition. The statement attributed to the railroad official, indeed, referred to the positions as switchman only as some then open in Baltimore or Washington, where the plaintiff never did take employment. If life employment was intended to be guaranteed, no specific task seems to have been contemplated for it, and no wages were mentioned or agreed upon. Tests of performance appear therefore to be lacking. The parties provided no means by which a court could determine their differences on either subject. While it is true that such informal conversation as that reported might naturally be lacking in specification, the fact does not provide an escape from the requirement of definiteness; it rather tends to indicate that no contract was in the contemplation of the parties. 'Such contracts at least should be specific and definite, with little or no room for misunderstanding, even if they are not required to be in writing.' Arentz v. Morse Dry Dock & Repair Co., 249 N.Y. 439, 164 N.E. 342, 344. On this construction, the decision in the Heckler case, supra, seems directly in point, and to support the right of the defendant to direction of a verdict in its favor; and the refusal to direct it could not be affirmed without overruling that decision."

This principle was reiterated and the alleged contract of employment for life held to be terminable at will in Chesapeake & Potomac Telephone Co. of Baltimore City v. Murray, supra, 198 Md. at pages 534, 536, 84 A.2d at pages 873, 874.

Part of the compensation to be paid the plaintiff was in the form of the issuance to him of new common stock. What tests of performance decided upon by the parties to the contract could the court have applied, if it had been called upon to do so, to determine whether or not the plaintiff had shown the ability required to make the business successful; whether or not the direction of the organization had been reasonable; or what constituted a reasonable amount of stock? The plaintiff's own testimony [17] as to

---

16. The defendants in the instant case contend, and the court agrees, that the changes in the plaintiff's position and duties during the course of his employment from 1944 to 1953 were substantial and significant changes and that the difference between a company's top operating officer and its credit manager is a real difference. It is equally as true that as his responsibilities decreased the plaintiff's salary increased from $8,840 to $11,700 per annum. That the plaintiff, himself, apparently did not consider these changes a departure from the alleged offer of employment serves to emphasize the indefiniteness of the offer and the lack of specification as to the work to be furnished and the wages to be paid.

17. Upon being examined by his own counsel, plaintiff testified regarding offers by Universal of employment in Lima, Ohio, where the administrative offices were being moved by the company for purposes of economy, which offers were made after the termination of his services:

"Q. Now, let us go back to Mr. Briscoe's interrogation on offers of employment from Universal. You went into

his interpretation of the alleged contract shows that he neither considered that he was bound to "execute such duties as may be required of him by the Presi-dent" nor to accept the salary being paid to him at the time of the execution of the contract, that is, $8,840 per annum. The alleged contract as construed by

detail about an offer of employment after Morton Clark [president of Universal] became angry. Were there any further offers of employment from Universal? A. They followed it up.

"Q. How did they follow it up? A. Mr. Schaeffer, the Director (?) [sic] of the company, Herbert Schaeffer, called me down to his office, and he used all his might to sell me the idea of going to Lima—wonderful place, beautiful city, fine living quarters, and nice people and associates.

"Q. Did he offer you any particular salary? A. *He offered $8,000.*

"Q. What was his position with the company? A. Then he had jumped up to Credits and Order Department— headed up the Credits and Order Department.

"Q. Did you receive any further— A. Now, prior to that and the same day that Clark offered me $6,000, by the time I got home he jumped it up to $7,000.

"Q. How about Gordon Sliter? Did he offer you a job? A. Gordon followed up for Clark.

"Q. Did you receive correspondence from him offering you a job? A. The offer had already been made when the correspondence originated.

"Q. Then, Mr. Sliter, you say, was acting for Mr. Clark? A. Yes, he is Clark's right hand man, very important man in the company.

"Q. You mentioned you were offered work in the Order Department at Lima. Had you been working in the Order Department theretofore, for the company? A. No, only incidentally.

"Q. Did you feel especially qualified or qualified to work in the Order Department? Was that in the line of work you had been doing before? A. *I have pretty rounded knowledge of office routine. It was not to my liking. I* would say, no.

"Q. Was it in line with the type of work you had been doing before you were discharged? A. *Not exactly, no —similar.*"

Examination by Mr. Winand (William T. Winand, Jr., co-counsel for the plaintiff) :

"Q. Let me ask you one question. Had you not been discharged and had the plant moved to Lima, as it did, and you would have *resumed the position* out there, *or* offered *one equivalent to*

*the one you had in Baltimore,* would you have accepted it? A. Yes, definitely.

"Mr. Briscoe: I object to that.

"The Witness: That is prior to my discharge.

"Q. Why would you have accepted it at that time if such a position had been offered to you, and you said you did not accept the offers made to you after you received notice of discharge? A. One thing would be the money.

"Q. In other words, the offer made to you to go to Lima was considerably less than you had been making? A. Considerably less.

"Q. Would there be any other reason why you would not have gone to Lima after you had received notice of discharge? A. No." (Plaintiff's deposition p. 41, 1. 20 through p. 44, 1. 21.)

On examination by Universal's counsel:

"Q. How much money would you have had to have offered you to have induced or persuaded you to go to Lima, Ohio? A. My then salary.

"Q. In other words, you would have had to have an offer—A. Of $11,700.

"Q. Of $11,700? A. Yes.

"Q. To have persuaded you to have gone to Lima, Ohio in 1953? A. Prior to my dismissal, yes." (Plaintiff's deposition p. 46, 1.2 through p. 46, 1.13).

"Q. Why was it you did not take a job in Lima, Ohio for $8,000? A. I did not want to go there at the time.

"Q. Why? A. There was several reasons. One—Clark intimated his lawyer told him he should offer me a job in Lima to violate the contract. That was one reason. That was the only reason.

"Q. Are you saying now that that offer of $8,000 was not a bona fides [sic] offer? A. Yes, it was a bona fides [sic] offer.

"Q. Why didn't you take it? A. Because I did not want it.

"Q. Why didn't you want it? A. *I told you I did not want to uproot here and leave Baltimore.* At that time if the job had been offered me prior to my dismissal, I would have considered it then even at $8,000, but they had positions in Baltimore they could have offered me. The company had positions in Baltimore they could have offered me paying somewhere around that. They did not offer me anything. They did not offer me anything else in Baltimore. They did not make me any offer for Baltimore.

the plaintiff may well be summarized in the following quotation from Baltimore & Ohio Railroad Co. v. King, supra, 168 Md. at page 147, 176 A. at page 628:

"The contract would be one of extraordinary extent, for according to the plaintiff's testimony he was guaranteed employment throughout his life, not that he should merely be taken on as an employee, subject to the vicissitudes of the business and the existence of jobs, but that he should be employed throughout his life at all hazards, regardless of the existence of jobs. And the employment was to be so far subject to his selection that he might reject jobs offered him which, though extremely easy, might require him to sit still longer than his nervous condition would permit, or might require him to pay higher house rents than he felt able to pay. Yet, as he describes it, the contract was for employment without definite limitation of the jobs which might fulfill the obligation on the side of the company."

Even had the plaintiff's duties, wages, other compensation, and place of performance been specified with the requisite definiteness, his alleged contract would not have been one of employment for life. The sentence "it is also our desire to have * * * William Winant [sic] * * * remain active in the business indefinitely, * * * *" can be construed only as meaning employment for an indefinite period. The plaintiff has attempted to rephrase the wording of paragraph 3 of the letter of June 9, 1944, so that the offer is that the plaintiff so long as he properly carries out his duties will remain active in the business indefinitely thus allegedly proposing permanent or lifetime employment, but this is not the wording of the so-called offer. The plaintiff's *salary* is to remain the same as long as he properly carries out his duties as determined by management while the *duration of employment* is for an indefinite period.

The plaintiff urges the "intention of the parties to enter into a contract of permanent or lifetime employment is [1] clear from the writing between and by the Plaintiff and other stockholders of The Baltimore Enamel and Novelty Co., predecessor to the Defendant Corporation, R. R. Trubey, Richard W. Case's decedent and the Corporate Defendant and its predecessors. However, if it be found that the words above stated when read together with the writings in their entirety are [2] vague and [3] ambiguous, then Plaintiff contends they are susceptible of interpretation by parole evidence." There is nothing am-

---

"Q. They were sending their personnel from Baltimore to Lima, weren't they? A. They had other jobs in Baltimore they knew I was qualified for.

"Q. Didn't Mr. Bosler tell you that your services in Baltimore were not required anymore, but that the personnel was moving to Lima, Ohio? A. He told me that, yes.

"Q. He told you that when he said your services were not needed anymore in Baltimore? A. That is right.

"Q. Those are the words he used? A. Yes." (Plaintiff's deposition p. 49, 1.20 through p. 51, 1.13.)

"Q. Why didn't you go to Lima? A. *I did not want to go. I had a contract calling for employment in Baltimore.*

"Q. Did you ever go to Lima to talk about a position with the company in Lima? A. No.

"Q. What was the reason you did not go to Lima? A. They did not offer me employment there until after my dismissal was final, and they did not offer me employment until I threatened suit under the contract. Under the circumstances I did not feel inclined to go, and the money was not sufficient.

"Q. In Mr. Sliter's letter to you dated May 13, 1953, he says that in the phone conversation he had with you, you said it was impossible for you to go out to Lima. Is that what you told him? A. I don't know. That certainly probably is [sic] not my words.

"Q. Did you say words to that effect? A. I said words to the effect that at this stage of life I did not want to be uprooted here and moved to a strange city." (Plaintiff's deposition p. 23, 1.11 through p. 24, 1.11.) (Emphasis supplied.)

biguous about the use of the word "indefinite" as applied to a period of time. As defined by Webster's New International Dictionary, 2nd Edition, Unabridged, p. 1262, indefinite means:

"1. Not definite; undetermined or indeterminate; specifically,

"a. having no definite or clear meaning, character, or purpose; vague or general; not precise or certain; as indefinite emotions; an indefinite language, plan.

"b. having no prescribed or predetermined limit; without stipulation or provision as to number or amount; * * *."

"2. Unmeasured or unmeasurable though not infinite; as, an indefinite period * * *."

"More specifically, as when used in employment contracts, the word means uncertain as to time, but does not mean perpetual * * *." 42 C.J.S. Indefinite, p. 560. The parties employed a well known word with a well known meaning for the purpose of defining the duration of plaintiff's employment. Parol evidence is never admissible to vary or contradict the unambiguous terms of a written instrument. To say that "indefinite" by its very definition means "uncertain" is not to say that the meaning or definition of "indefinite" is uncertain but were the use of the word "indefinitely" to cause uncertainty as to the duration of the plaintiff's employment still no recourse could be had to parol evidence.

"Parol evidence may be admitted to *clarify* an indefinite description of land (Helmik v. Pratt, 153 Md. 685, 139 A. 559), but it is never admissible to supply an omitted term *or make definite and certain that which the parties themselves have left indefinite and uncertain.*" (Emphasis supplied.) Kalavan v. Ham-

burger, 1940, 178 Md. 218, 229, 13 A.2d 343, 348.

Finally, if the term employed were found to be ambiguous such a finding must be based, the plaintiff alleges, upon a reading in their entirety of the documents upon which he relies. What then the plaintiff is alleging is the existence of a patent ambiguity.

"Much time, ingenuity, and labor have been expended in applying Lord Bacon's rule, that latent ambiguities may be explained by parol evidence but that patent ambiguities may not. The basis of the rule is thought to be that where the doubt does not appear on the face of the instrument the introduction of parol evidence merely completes the instrument by identifying its object or its subject-matter, while where the doubt is patent and too uncertain for settled construction, to permit its meaning to be fixed by parol evidence would be not to construe the instrument under consideration but to create a new one." (Lambdin v. Dantzebecker, 1935, 169 Md. 240, at page 246, 181 A. 353, at page 356, 102 A.L.R. 277).

The Maryland Court of Appeals, while recognizing the rule, has pointed out the difficulty of applying it and has indicated where there is any doubt as to the meaning or application of a word parol evidence should be admitted. (Lambdin v. Dantzebecker, supra, 169 Md. at pages 246–247, 181 A. at pages 355–356; Applestein v. Royal Realty Corporation, 1942, 181 Md. 171, 174–175, 28 A.2d 830). This court, finding no doubt but desiring that the plaintiff have every opportunity to develop his case, requested that the plaintiff make a proffer of the evidence on which he would rely if it were held to be admissible.[18] The proffer

---

18. The plaintiff's proffer of testimony relative to this issue is:

"* * * That the Plaintiff intends to produce testimony through the witness, George Ross Veazey, explaining the meaning of Mr. Trubey's promise to the Plaintiff, among others, that the Plain-

tiff's salary 'would remain the same * * * as long as he properly carried out his duties' and that the Plaintiff 'would remain active in the business indefinitely'; that said testimony will show that the use of these words was understood both by Mr. Trubey and the

shows that the plaintiff being incompetent to testify, by statute,[19] as to his transactions with Trubey, now deceased, would seek to have an attorney, whose testimony both individual and corporate defendants have foreclosed by a claim of attorney-client privilege, testify as to the subjective, not the manifested, intent of both the plaintiff and Trubey.

This case presents a strong example of the reason for the parol evidence rule, and for its application. Here the plaintiff wishes by parol evidence to show that "remain active in the business indefinitely" does not mean "indefinitely," but "for life or until normal retirement." There is not a word in the record about either of these periods of employment. The proffer, if admitted, would require further parol evidence: did plaintiff undertake to work for Baltimore Enamel for life; what was the age of "normal retirement"; was retirement at such age obligatory or optional?

What plaintiff in effect says is that as of August 1, 1944, he had, or should have had, a written contract of employment with some one. In 1957, after the death of the other individual through whom this contract was made, plaintiff seeks to have this court build from this straw a contract for a definite term, despite the authorities cited below that

a hiring for an indefinite period is a hiring at will.

Accordingly, the testimony proffered by the plaintiff is inadmissible.

■■■ Thus, even if it were held that the plaintiff's offer to Trubey of his two and one-tenth percent interest in the stock of Baltimore Enamel constituted consideration to Trubey and that Trubey on becoming sole equitable owner of Baltimore Enamel could and did act in some way to bind the corporation, the plaintiff's contract was at the most a contract of employment for an indefinite period. The law is well established that a hiring for an indefinite period of time is terminable at the will of either party (McCullough Iron Co. v. Carpenter, 1887, 67 Md. 554, 557, 11 A. 176; Home News, Inc., v. Goodman, 1944, 182 Md. 585, 595, 35 A.2d 442; I Williston on Contracts, Revised Edition, Section 39, p. 106; Annotation, Contract of Hiring-Duration, 11 A.L.R. 469; Annotation, Contract of Hiring—Duration, 100 A.L.R. 834; Annotation, Contract of Hiring—Duration, 161 A.L.R. 706). The court is not unmindful of the fact that an exception to this rule may arise where an employee or agent furnishes consideration in addition to his services in that he must be retained in his employment for a reasonable period of time (Jack's Cookie

Plaintiff to mean employment of the Plaintiff for life or until normal retirement; that the said testimony will show further the memorandum of July 18, 1944, entitled 'Plaintiff's Exhibit A', heretofore filed in answer to Interrogatories which [sic] was prepared by Mr. Trubey himself.

"That the above proferred [sic] testimony was communicated by George Ross Veazey to William T. Winand, Jr. and John H. Hessey, IV, Counsel for the Plaintiff, at a personal interview, but is not before this Court at this time in spite of the Plaintiff's efforts to obtain this testimony in deposition form; that at the taking of the deposition of George Ross Veazey, he refused to testify in response to questions propounded by Plaintiff's counsel designed to produce the above set forth testimony on the sole grounds of confidential relationships between the attorney and his former clients, both the Plaintiff and the

corporate Defendant's predecessors, unless instructed to do so by the Court."

19. Art. 35, Sec. 3:
"In actions or proceedings by or against executors, administrators, heirs, devisees, legatees or distributees of a decedent as such, in which judgments or decrees may be rendered for or against them, * * * no party to the cause shall be allowed to testify as to any transaction had with, or statement made by the testator, intestate, ancestor or party so incompetent to testify, either personally or through an agent since dead, lunatic or insane, unless called to testify by the opposite party or unless the testimony of such testator, intestate, ancestor or party incompetent to testify shall have already given in evidence, concerning the same transaction or statement, in the same cause, on his or her own behalf or on behalf of his or her representative in interest; * * *."

Company v. Brooks, 4 Cir., 1955, 227 F.2d 935, 938–939, certiorari denied 1956, 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443). Here the plaintiff is not suing to recover damages for breach of a contract of employment for a reasonable period of time but rather to recover damages for breach of a contract of employment for life, a cause of action which as a matter of law the plaintiff has failed to sustain.

Summary judgment for the defendants.