**BEVERAGE DISTRIBUTORS, INC., a corporation, Plaintiff-Appellant,**

v.

**OLYMPIA BREWING CO., a corporation, Defendant-Appellee.**

No. 25463.

United States Court of Appeals, Ninth Circuit.

March 1, 1971.

Rehearing Denied April 6, 1971.

Certiorari Denied June 7, 1971. See 91 S.Ct. 2209.

Benjamin Parkinson (argued), Willard S. Johnston, of Ackerman, Johnston, Norberg & Parkinson, San Francisco, Cal., for plaintiff-appellant.

David Brice Toy (argued), John C. McHose, Pamela Ann Rymer, of Lillick, McHose, Wheat, Adams & Charles, Los Angeles, Cal., Harry M. Henke, of Skeel, McKelvy, Henke, Evenson & Betts, Seattle, Wash., for defendant-appellee.

Before: BROWNING, WRIGHT and TRASK, Circuit Judges.

TRASK, Circuit Judge:

This is an action by Beverage Distributors, Inc. to recover treble damages from Olympia Brewing Company under Section 4 of the Clayton Act, 15 U.S.C. § 15, for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for injunctive relief. 15 U.S.C. § 26. Jurisdiction is also invoked under 28 U.S.C. § 1337. (General jurisdiction of district courts over trade restraints and monopolies).

## FACTS AND CONTENTIONS

Olympia Brewing Company (Olympia) with its principal brewery in Tumwater, Washington, is a brewer of various beer

products. It has been in business on the west coast and elsewhere for many years marketing its brew to the public through sales to distributors who buy in quantity and at a wholesale price. The distributor or wholesaler markets his beer to the retailer who sells to the consumer. Olympia in 1969 was the second largest selling beer in California and in 1960 was the fourth largest. Beverage Distributors, Inc. (B.D.I.), is a licensed beer wholesaler distributing beer, among other products, in California, Nevada and Arizona.

At the time B.D.I. began distributing Olympia products, B.D.I. was a wholly-owned subsidiary of Safeway Stores, Inc., and was the only entree which a brewer had to place its products with Safeway's stores as a retail outlet. Safeway did not purchase any beer for its stores other than through B.D.I. and B.D.I. did not sell any beer except to Safeway. B.D.I. also sold other brands of beer to Safeway in the same manner.

On June 28, 1953, Olympia appointed B.D.I. a distributor for its beer. Exs. S; T. The letter of appointment contains no restrictions on the territory to be served by B.D.I. or on the customers to whom B.D.I. could distribute Olympia beer. It described the relationship as one necessarily based upon mutual trust and confidence, and contains no provision for any definite term.[1]

Other distributors were also appointed by Olympia from time to time. They were principally those already in the beer business and, when appointed, their appointment outlined the areas they were then serving and they were expected by Olympia to properly service every account in their own area. As distribution expanded, territories over which Olympia distributors assumed responsibility to provide full service tended to be non-overlapping. Full service required by Olympia included the duty of the distributor to have every type of Olympia package on the retailer's shelves, to support Olympia merchandising programs, to make deliveries promptly and regularly, to rotate beer and generally to promote the brewer's sales techniques and to protect the quality of the product.

Sometime in early 1958 a group of B.D.I. employees purchased the entire capital stock of that company from Safeway. There was testimony that in June of that year B.D.I. began selling beer to customers other than Safeway. As a result of the change in ownership and in policy, a number of brewers such as Hamm, Budweiser, Burgermeister, Falstaff and Schlitz ceased making deliveries of beer to B.D.I. B.D.I. contends that this constituted a boycott in which Olympia participated with other brewers and that it caused B.D.I. to enter into a written agreement with Olympia in July 1958 in which B.D.I. agreed that it would bow to the territorial and customer restrictions which Olympia imposed upon it.[2] B.D.I. contended these restric-

---

1. Exhibit S refers to a policy statement of 1896 by the founder of the Olympia Brewing Company which was "enclosed." The enclosure was not found among the exhibits. A restatement of at least a portion of this policy was contained in Ex. U, dated June 21, 1960 from Adolph Schmidt, Jr., President of Oylmpia, to A. D. Morton, president of B.D.I. Among other statements of Olympia policy was the following:

> "As has been explained to you, at no time do we consider there is any value attached to a distributorship of Olympia Beer. In other words, you have purchased nothing nor, should we ever find it necessary to make a change, have you anything to sell."

Mr. Morton acknowledged receipt of this letter on June 24, 1960, Ex. V, saying:

> "We still have in our files your letter of June 2, 1953, welcoming us as Olympia distributors in California and outlining your policies.
> "We are happy to be a member of the Olympia family, and compliment you on the high level of your business principles which go hand in hand with the outstanding quality of Olympia Beer."

2. The principal criticism of B.D.I. expressed by a brewery official at a July 2, 1958, meeting leading up to the boycott was that of Mr. Picard, an official of Burgermeister Brewing Company. Subsequently, and prior to July 11, 1958,

tions prevented it from competing for retailer customers in territories allocated to other Olympia distributors who sold at higher prices. This boycott, with its claimed continuing effect, constituted the first alleged violation of the Sherman Act. Brief for appellee at 12.

The second asserted violation of Section 1 of the Sherman Act is alleged to have occurred in 1967. In June of that year the Supreme Court decided United States v. Arnold, Schwinn & Co., 388 U. S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). As a result of the pronouncements contained in that decision on August 7, B.D.I. notified Olympia that B. D.I. intended to compete with other Olympia distributors for the sale of Olympia beer to retailers other than Safeway. In September of 1967, Olympia adopted and put in operation a fair trade program, lawful in California, the effect of which was to prevent B.D.I. from selling below Olympia's "suggested" prices. The adoption of this fair trade program is the second alleged violation of Section 1. Thereafter B.D.I. continued to make sales of Olympia beer to retailers other than Safeway at fair trade prices. When further orders came to Olympia Brewing Company from B. D.I., Olympia refused to fill them. B. D.I. had filed this action in the meantime and the Olympia executives stated, as their reason for Olympia's refusal to deal, that they could not do business with someone in whom they no longer had confidence and who had lost confidence in them. This refusal to deal constituted the third alleged violation of the Sherman Act.

This action was filed on August 30, 1967, seeking treble-damages for violations of Section 1 as well as injunctive relief against the refusal to deal. A preliminary injunction enjoining Olympia from refusing to sell to B.D.I. is still in effect.[3] The action came on for trial and a lengthy jury trial was held. The reporter's transcript contains over 2,500 pages with 210 exhibits for the plaintiff and 48 for the defendant. At the conclusion, the issues were submitted to the jury under a form of general verdict covering liability as well as damages. Most of the factual issues were in sharp disagreement. The plaintiff made no objection to the instructions given but asserts error in two refused instructions. The plaintiff also complains of the introduction of certain evidence. The jury having been instructed upon both liability and damages found for the defendant. The trial court considered a motion for judgment notwithstanding the verdict and in the alternative for a new trial and denied both.[4] We affirm.

## EFFECT OF THE VERDICT OF THE JURY

When a jury verdict has been returned and it has been considered by the trial judge in the light of a motion for judgment notwithstanding the verdict and in the alternative for a new trial, the scope of appellate review is strictly limited. It then becomes our duty to affirm if all of the evidence together with favorable inferences therefrom reasonably supports the determination of fact made by the jury, and the judgment of the court rendered thereon. Tennant v.

(when B.D.I. asserted it was coerced into an agreement with Olympia containing territorial and customer restrictions by the same boycott) B.D.I. and Safeway as plaintiffs filed a complaint in the Federal Court at San Francisco against "certain brewers and others under the federal antitrust laws," which included Burgermeister. Although B.D.I. now complains that Olympia participated in that illegal boycott it did not then join Olympia as a party defendant to that suit.

3. This court's opinion modifying the injunction is reported in 395 F.2d 850 (1968).

4. "The issues in this case, involving conflicting testimony and evidence susceptible of different inferences concerning the central issue of combination and conspiracy vis a vis independent action, having been fully and fairly presented to a jury, as demanded by plaintiff, and the jury having by its general verdict resolved said and all other issues against plaintiff and, it appearing to the court that said verdict is not so inadequately supported by the evidence as to require a new trial. * * *" C.T. 618.

Peoria & Pekin Union Ry., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944); Insurance Co. of North America v. Thompson, 381 F.2d 677, 681 (9th Cir. 1967); Sunkist Growers, Inc. v. Winckler & Smith Citrus Produce Co., 284 F. 2d 1, 17–18 (9th Cir. 1960), modified, 289 F.2d 933, reversed on other grounds, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709, 712 (9th Cir. 1959), cert. denied, 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960). Cf. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 124, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); A. & G. Stevedores v. Ellerman Lines, 369 U.S. 355, 364 (1962). In this posture of the case we are required to view the evidence in a manner most favorable to the prevailing party. As appellant correctly points out, however, these familiar rules of construction do not entirely foreclose appellant's rights even on factual matters, for if the undisputed facts clearly disclose that the appellee was not entitled to succeed, this court should not and would not hesitate to set aside the judgment. Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

Likewise, if the verdict of the jury or the judgment of the district court that Olympia did not violate the Sherman Act, was premised on an erroneous legal standard to be applied, the verdict and judgment could not stand. United States v. Parke, Davis & Co., 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). In this instance we do not believe the verdict and judgment contain either frailty.

## THE TERRITORIAL AND CUSTOMER RESTRICTION CLAIM

B.D.I. relies first of all upon activity of Olympia which it asserts amounts to an unlawful restriction upon the right of B.D.I. to compete with other distributors of Olympia beer in territories which the latter serve. This, it contends, is a per se violation of Section 1. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). The activity of Olympia relied upon by B.D.I. consists of Olympia's participation in an alleged boycott of B.D.I. by a number of national brewers calculated to force B.D.I. to observe territorial and customer restrictions, and an exchange of correspondence which B.D.I. asserts constituted an agreement forced on B.D.I. by Olympia to observe such restrictions. Both events occurred in 1958, but with effects asserted to continue until 1967.

With respect to the asserted boycott, it appears that in June 1958 a group of B.D.I. employees purchased all of the capital stock of B.D.I. from Safeway Stores, Inc., the prior owner. Before that date there had been no effort by Safeway to use its wholly-owned subsidiary, B.D.I., for any purpose other than to service its own stores. Upon separation of B.D.I. and Safeway, B.D.I. began selling beer to customers other than Safeway, although none of Olympia's products were so sold. Shortly after this there was a California Brewers Association meeting in San Francisco. Most of the major breweries had representatives in attendance. Olympia was only an associate member but its President, Mr. Schmidt, was present at the association meeting. It was at this meeting that Mr. Picard, President of Burgermeister Brewery, related to some of the officials of other breweries the changed plan of B.D.I. to distribute beer products and expressed Burgermeister's considerable concern over the change. There was no concert of action proposed or entered into nor did Mr. Schmidt make any comment or offer any suggestion. There were later meetings including one at Mr. Picard's office, but Mr. Schmidt did not attend. Some of the major breweries halted shipments to B. D.I. at about this date or a little later. B.D.I. introduced evidence to the effect that Olympia's sales manager notified B.D.I. that Olympia would make no further shipments to B.D.I. until he had an opportunity to discuss basic policy with his principals who were not available at

this time. Ex. 41, R.T. 310–13.[5] Phillip Hannah, Sales Manager of Olympia, testified that he was not aware that any other breweries had stopped making shipments to B.D.I. in July of 1958. R. T. 1243–45.

This brings us to the second item of evidence upon which B.D.I. relies to establish a per se territorial and customer restriction. This consists of an exchange of letters beginning with a letter of B.D.I. to Olympia under date of July 11, 1958, Ex. 51, and a response thereto from Olympia dated July 28, 1958. Ex. 52. The letter from B.D.I. was unsolicited and enclosed a "courtesy copy" of an antitrust complaint filed by B.D.I. and Safeway against certain brewers and others. It explained some of the B. D.I. problems and contained these two paragraphs:

"Some brewers have recently expressed fear that we might sell their product, without their consent, to retailers other than Safeway. You may rest assured that we shall not sell your products to anyone other than Safeway without your prior consent and approval.

"Circumstances change, of course, and if opportunities for a broader form of distribution should arise, we would like to feel free to discuss them with you."[6]

On July 28, 1958, Mr. Halgren, Sales Manager of Olympia, replied thanking B.D.I. for the "courtesy copy" of the antitrust complaint against others but stating he did not understand it and hence passed it to the company attorneys. He continued:

"In regard to the third and fourth paragraphs of your letter, we would at the present time desire to hold yourself [sic] to your indicated commitment not to sell our product to anyone but Safeway. If you should desire to effect sales to others than Safeway, please immediately contact us so that we may review the whole situation."

Two observations are made by Olympia about (1) the boycott and (2) the territorial restriction. There was no evidence in the record that Olympia knew of or participated in any such boycott or consulted with any other brewer about it. Indeed the testimony of Olympia's officials is to the contrary. The fact that Safeway and B.D.I. filed an antitrust suit against Burgermeister and Falstaff at this time but did not join Olympia to whom it sent a "courtesy copy" of the complaint would indicate that B.D.I. did not consider Olympia a participant. The imposition of territorial and customer restrictions by Olympia on its distributors was flatly denied by Olympia officials and some of the distributors who testified.[7]

---

5. B.D.I. leans heavily for support of its boycott theory and its restriction argument on a B.D.I. memorandum of a telephone conversation which occurred on July 3, 1958, when Art Halgren of Olympia called A. D. Morton of B.D.I. and stated he was not going to fill existing orders for Olympia products "until he had an opportunity to discuss basic policy with his principals." This memo stated that B.D.I.'s Morton affirmed that it had not sold any Olympia to others "and had no intention of doing so." When asked by Halgren if this was a temporary policy, Morton said, "that as far as we knew now it was our policy for the foreseeable future," and that if the policy changed "we would discuss it with the brand owner involved." Neither Halgren or Morton testified at the trial but Hannah, Ass't. Sales Mgr. at the time, testified that he had not talked to Morton on this subject and knew of no one else in Olympia who had done so. R.T. 1301. Thus we are entitled to assume that there was an evidentiary conflict on this fact question and that it was resolved against B.D.I. The contention that this conversation is a matter of uncontroverted evidence cannot be supported.

6. An exact duplicate of this letter was sent to Schlitz Brewing Co., Hamms Brewing Co. and Anheuser-Busch Brewing Co.

7. There was other evidence introduced by B.D.I. suggesting territorial restrictions. (Plaintiff's Exs. 99 & 100 in particular). Olympia officials explained this evidence by asserting that it insisted that its distributors properly "service" its accounts, i. e., see that all types of Olympia pack-

All of the 1958 evidence, which was the basis for the charge of horizontal restraint by boycott and the vertical restraint by exchange of letters, pre-dated the four year limitation period of the Act (15 U.S.C. § 15b) which restricts plaintiff's proof to the period from September 1, 1963, to August 30, 1967. Over objection, the court admitted such 1958 evidence for the limited purpose, if the evidence did so, of illuminating the subsequent conduct of Olympia but not for the purpose of establishing liability.[8]

Much of whatever law was unsettled about territorial and customer restrictions prior to June 12, 1967, was resolved in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). That case involved challenged vertical restrictions as to territory and dealers. The restrictions were assertedly imposed by the manufacturer of bicycles who had two methods of distribution. One was its practice of franchising of retailers in which Schwinn retained all indicia of ownership including title, dominion and risk. The imposition of restrictions in this situation was held not to be an unreasonable·restraint of trade where the facts disclosed:

"(1) that other competitive bicycles are available to distributors and retailers in the marketplace, and there is no showing that they are not in all respects reasonably interchangeable as articles of competitive commerce with the Schwinn product; (2) that

---

ages were on the shelves, that the beer be rotated so that stale beer would not be sold, carry out point of sale merchandising programs, etc., and that the ability of the distributor to provide such service constituted the only restraint upon his territory.

Exhibit 99 was an affidavit filed by Olympia as a co-defendant with others (including B.D.I.) in a suit brought by Thriftimart, Inc., seeking a mandatory injunction to force Olympia to sell to Thriftimart through B.D.I. Among other statements in the affidavit dated September 23, 1965, by T. L. Morgan, Finance Officer of Olympia, is one bearing on the letter correspondence of 1958.

"10. At no time has Olympia Brewing Company entered into a conspiracy with any one or more brewers or with BDI or any other entity for the purpose of preventing or restricting BDI from selling Olympia Beer to Thriftimart, Inc., the Plaintiff in the above referred to suit. Furthermore, while BDI has informed Olympia Brewing Company that is will not sell Olympia Beer to any retailer other than Safeway without first obtaining the consent of Olympia Brewing Company, such consent has never been requested nor has Olympia Brewing Company ever informed or advised BDI that it cannot sell Olympia Beer to Thriftimart, Inc. or any other retail account."

8. The court admonished the jury as follows when the evidence was introduced:

"Now, regardless of how this issue may be determined, a law called the Statute of Limitations limits the period for which plaintiff B.D.I. here can claim violation of the anti-trust law and recover damages therefor to the period of four years preceding the commencement of its present lawsuit. This lawsuit was commenced on August the 30th, 1967. Thus, the preceding four years would go back only to August 30th, 1963. B.D.I., therefore, cannot rely on acts of Olympia done before August the 30th, 1963, to fix liability of Oylmpia for violation of the antitrust law, even if prior to that date, that is, prior to August 30th, 1963, acts of Olympia were, we can assume, in violation of the anti-trust laws.

"B.D.I., therefore, must rely, for its purposes in this case, upon the acts of Olympia occurring after August the 30th, 1963.

"Consequently, the jurors must look only to the acts of Olympia occurring after August 1963, in determining whether Olympia violated the anti-trust law. That is, whether Olympia, in its dealings with B.D.I. during the four-year period prior to commencement of its lawsuit, was acting independently for its own business interests, as it claims, or was acting in agreement, combination or conspiracy in restraint of trade with other brewers or distributors." R.T. 707–08.

No objection was made to this admonition nor to the court's instruction in the same vein at the close of the case. R.T. 2326–28.

Schwinn distributors and retailers handle other brands of bicycles as well as Schwinn's; (3) in the present posture of the case we cannot rule that the vertical restraints are unreasonable because of their intermixture with price fixing; and (4) we cannot disagree with the findings of the trial court that competition made necessary the challenged program; that it was justified by, and went no further than required by, competitive pressures; and that its net effect is to preserve and not to damage competition in the bicycle market." 388 U.S. at 381–382, 87 S.Ct. at 1867 (footnote omitted).

■ The rule of reason is to be applied in such a situation. As to outright sales, however,

"Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act." *Id.* at 382, 87 S.Ct. at 1867.

The rule applies not only to sales to distributors but also as to sales to retailers. *Id.* at 378, 87 S.Ct. 1856.

■ Here the appellant's first argument is directed at a horizontal restraint. It asserts that there was concerted action among brewers which amounted to a combination or a conspiracy to boycott B.D.I. unless and until it would come to heel and limit its sales to its primary customer, Safeway. The difficulty with appellant's position is that there was no direct evidence of such a plot in which Olympia participated. Olympia officials denied it. The situation occurred in 1958. There was little if any evidence that it continued after August 30, 1963, and into the period not barred by limitation. There was direct evidence to the contrary. The jury found against the appellant and the court refused relief notwithstanding the verdict. Much of the evidence was testimonial. We do not find it so unsubstantial that we can set aside the judgment.

Combination and conspiracy having been determined against appellant, we turn to a consideration of the exchange of correspondence in 1958. Was there contained within the text of that exchange either an explicit agreement or an implied or silent understanding between the lines as would constitute a per se violation? And if there were, did it continue from July 1958 beyond August 30, 1963, to infect the relationship between the parties during the actionable period?

In contract terms the letters do not constitute an agreement. The first two paragraphs of the letter of July 11, 1958, are explanatory only. The third and fourth paragraphs which are quoted above contain what appellants term to be the "offer" as expressed in contract terms. Yet in such terms it does not offer to buy in any amount for any price or for any length of time. It does, of course, state that B.D.I. will not sell any Olympia products to anyone other than Safeway without Olympia's prior consent and approval. It continues, however, to say that if "opportunities for a broader form of distribution should arise," B.D.I. would like to feel free to discuss them. An implication open to the jury therefore would be that the historical pattern of distribution by B.D.I. exclusively to Safeway is satisfactory and that B.D.I. has no existing better or broader form of distribution. But if one should arise, B.D.I. would like to explore it. It certainly does not intimate that its present desire is to sell to others and that it proposes to forego that right in consideration of a counter promise from Olympia.

The Olympia reply simply states that "at the present time" Olympia would like B.D.I. to hold itself to its indicated manner of distribution, i.e. to Safeway. It does not, however, foreclose different arrangements but asks only that it be contacted so that Olympia may review the whole situation in the event of a change.

It is to be noted that the letter written by B.D.I. was unsolicited. There was no evidence of a demand or even a request by Olympia for any letter from B.D.I. There had been a complete change in the corporate ownership and the letter was an affirmation of the fact of "business as usual." It was a message of reassurance. The B.D.I. letter did not require or even request a response. The Olympia letter was equally unsolicited and equally general. Although appellants suggest that it was a contract until terminated, the language clearly shows that it was B.D.I. which reserved the option to alter its policy. Olympia only requested that B.D.I. continue its announced intention to continue the usual business practices "for the present time" and invited a discussion of a change at any time B.D.I. should wish it. There was no statement that there would be a refusal of any change which B.D.I. proposed. Failure of appellant to request a change of Olympia under these circumstances could only indicate its satisfaction with the existing arrangement and a willingness to continue under it "until opportunities for a broader form of distribution," should arise.

■ A gratuitous and unsolicited statement of policy or of intention which receives the concurrence of the party to whom it is addressed, does not constitute a contract. Goetz v. State Farm Mutual Automobile Insurance Co., 31 Wis.2d 267, 142 N.W.2d 804, 807 (1966); 1 Williston on Contracts (3d ed., Jaeger) § 1A, p. 5. Or as it is sometimes stated, since an offer must be a promise, a mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer. Lahaina-Maui Corp. v. Tay Tet Hew, 362 F.2d 419 (9th Cir. 1966); Winand v. Case, 154 F. Supp. 529 (D.Md.1957); Parrish v. General Motors Corp., 137 So.2d 255 (Fla. App.1962); 1 Williston, id., § 26, p. 59. In *Winand* as here reliance was upon a letter dated June 9, 1944, and a response thereto. Paragraph 3 of the letter began:

"3. *It will be desirable to us* that your present president, Mr. Henry A. Brehm, become Chairman of the Board and be paid a salary of $2,500 per year so long as the operations justify; * * * *it is also our desire to have both William Winant [sic] and George Blome remain active in the business indefinitely, and it is our intention that, if they show the ability and application required to make the business successful under reasonable direction of our organization, they shall have a reasonable amount of the new common stock,* which will be issued exclusively to members of our organization. * * * *"* 154 F.Supp. at 533. (Emphasis in the original opinion).

Winand sued to recover damages for breach of a written contract to employ him for life. The court denied relief saying that "at the most" the plaintiff had a contract of employment for an indefinite period, terminable at will. In *Winand* the proposals were considerably more formalized than the exchange of letters here. The court said:

"The aforegoing conclusions aside, the plaintiff still, as a matter of law, could not recover. The wording of the letter of June 9, 1944, and in particular the wording of paragraph 3 therein, are subject to the criticism advanced by Judge Parker in Lucas v. Federal Reserve Bank of Richmond, 4 Cir., 1932, 59 F.2d 617, 619:

'It is clear that the first cause of action states no ground of relief either in contract or in tort. The allegation that the Reserve Bank promised to "extend such additional accommodations in the way of discounts as would be necessary to meet the additional burden assumed" sets forth none of the essential terms of a contract. It does not show the amount of credit to be extended, *the period of the credit,* the *amount or kind of security* to be deposited as collateral, or *the interest*

*to be paid.* The court cannot see by reading it any definite agreement which the law could enforce. In the language of Mr. Justice Holmes, "On the face of it, it does not import a legally binding promise, but rather a hopeful encouragement, sounding only in prophecy." Hall v. First Nat. Bank of Chelsea, 173 Mass. 16, 53 N.E. 154, 155, 44 L.R. A. 319, 73 Am.St.Rep. 255. It is well settled that such a vague promise does not constitute a binding and enforceable contract. (Emphasis supplied)." Winand v. Case, *supra*, 154 F.Supp. at 541–542.

Judged again by standards of contract law as appellant proposes, it is plain that where the promisor retains the unlimited right to decide later the nature or extent of his performance the promise is illusory. Eastern Transportation Co. v. Blue Ridge Coal Corp., 159 F.2d 642 (2d Cir. 1947).

 Even though Section 1 of the Sherman Act speaks in terms of "contract", it appears clear that appellant, in the light of *Schwinn*, attempts to prove more than is required. For from *Schwinn*, we apparently learn that Section 1 violations are not judged by formal contract principles. Rather the Court says that once the manufacturer has parted with title and risk, any "effort" to restrict territory within which the purchaser may re-sell or persons to whom the product may be transferred is a per se violation. Accepting the language of *Schwinn* read as narrowly as appellant could urge upon us we still cannot find that the necessary vertical restraint has been imposed. With respect to any conspiracy or combination to impose vertical territorial or customer restrictions, that problem has been determined by the jury which found no such restrictions. The trial judge has re-examined the matter on a motion for judgment n.o.v. and has determined that the verdict "is not so inadequately supported by the evidence as to require a new trial" and has denied the motion.

We cannot say that those two judgmental decisions on conflicting evidence should be overturned. Nor do we find from an examination of the instructions and rulings that there has been any erroneous application of principles of law as in *Albrecht, supra.* So we return again to the question as to whether or not the letter exchange constitutes an effort at restraint. We have noted that it does not constitute a contract. Likewise it would support a jury finding that it does not constitute an "effort" to impose territorial or customer restrictions. As of 1958 the responsive letter of Olympia is in terms of "we would desire" that you hold yourself to your indicated commitment. It does not say "we insist" or that "we must require" or that "we demand." And, of course, it invites a review of the situation should, as B.D.I. suggests in its opening letter, "circumstances change" with new opportunities opening which would stimulate a desire for B.D.I. to "discuss them with you." The proposal which the new ownership of B.D.I. made in 1958 was one which left the initiative up to B.D.I. to suggest opportunities for a broader form of distribution for B.D.I. Assuming arguendo that it was a continuing contract from day to day, or for a reasonable period, there is no evidence that B.D.I. ever requested or even suggested a policy change. On the contrary, there was evidence that other distributors did sell outside of their service areas and Olympia did nothing about it. R.T. 1515–17. There is also evidence that other distributors could sell at prices which varied from the suggested prices and Olympia did not complain. R.T. 1568. The jury was justified in believing that B.D.I. was under no greater restraint. The 1958 evidence was outside the limitation period for liability to be imposed and the court so instructed with no objection from either side. The liability period began on September 1, 1963. There were no requests by B.D.I. for a discussion of different arrangements after 1963. Failure to request

any change under these circumstances would justify an inference of their satisfaction with the existing arrangement.[9]

The restraint upon B.D.I. in 1958, by the terms of Olympia's letter was "for the present." Beginning September 1963 both the method of doing business by Olympia, its instructions to sales people by sales executives and its official company policy as set out by its counsel, would indicate no restraint upon B.D.I. If any restraint was felt, it was self imposed. *Id.*

## THE FAIR TRADE PROGRAM OF OLYMPIA

B.D.I. notified Olympia by letter dated August 7, 1967, that it intended to broaden its base of distribution by re-selling to certain other customers. Ex. 12. The announcement indicated that the additional customers to whom sales would be made were customers of a type who would themselves handle Olympia products through a central warehouse system and did not include any small retail accounts. The response of Olympia to the August 7, 1967, announcement was that "it is the position of our company that every distributor has a right to sell to customers of his own selection." Ex. 13.

However the announcement did compound a concern which Olympia already had with B.D.I. This was its concern with the typical method of warehouse distribution to chain outlets typified by B.D.I., which Olympia believed resulted in loss of quality control. R.T. 186–91; 1069; 1310. It was the judgment of the executives of Olympia that there were three business decisions that could be made in the light of the announcement by B.D.I. First, to do nothing and run the risk of poor handling and damage to

company image with the public; second, to cease deliveries; and, third, to institute a fair trade program with wholesale distributors which management felt would deter the proliferation of warehouse distribution. The president of the company chose the latter alternative.

"Fair trade," of course, simply means an agreement by which the manufacturer fixes the price at which the wholesaler or retailer, as the case may be, can legally re-sell the product. Such an agreement, if otherwise lawful, binds not only the signers but the non-signers of the fair trade contract.

The anathema of price fixing underlying the Sherman Act has been softened somewhat by the fair trade statutes. Congress by enacting the Miller-Tydings Act and, later, the McGuire Act has permitted price fixing so long as it is subject to the limitations of those amendments. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). Those limitations permit price fixing only where:

1. The commodity or label bears the trademark, name or brand of the producer or distributor.

2. The articles fair-traded are in free and open competition with other commodities of the same general class produced or distributed by others; and

3. The fair trade agreements are lawful in the state where the resale is to be made.

Overall is still the proscription that whatever may be the rights of the individual producer to enter into vertical agreements with those who distribute or

9. In July 1966, Sherman Huffine, vice-president and legal counsel for Olympia sent a memo to Harry Moore, district manager for the Los Angeles area in which he instructed Mr. Moore to express company policy as follows:

"Olympia Brewing Company cannot and does not tell its distributors to whom they should sell, that we do not interfere with the sales procedures of our distributors, that they have free choice of customers and that our company sells only to its distributors, who are licensed wholesalers."

sell his goods to maintain their resale price, he may not enter into any agreement or combination with other producers to utilize fair trade agreements to fix prices and thus violate the basic purpose of the Sherman Act. United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945). In other words, fair trade agreements may not be used as a subterfuge to accomplish purposes otherwise illegal under the antitrust laws.

■ There does not appear to be any argument but what the first three conditions for fair trading are met here. The product is clearly identified under the label of Olympia Brewing Company as an Olympia product; there are numerous national and regional beers competing in the same market, some of them out-selling Olympia; and, finally, fair trade agreements are lawful in California and were at the dates in question. Cal.Bus. & Prof.Code, §§ 23,004, 24,749, 24,750 [10] (West Supp.). B.D.I. does contend, however, that a combination existed which made fair trade agreements unlawful. This combination, it is asserted, was one among Olympia's wholesalers and their trade association to establish a market-wide fair trade program and thus indirectly force B.D.I. out of its central warehouse delivery system. Whether there was such a combination as would make unlawful the otherwise lawful fair trade agreements was a question for the jury on disputed facts. The court gave careful instructions on the entire subject. Those instructions met with the approval of all counsel. The verdict of the jury and the judgment of the court supporting appellee's position on this point is supported by very substantial evidence.

Appellant also argued the theory that a violation of Section 1 was complete when B.D.I. acquiesced in the resale price maintenance program initiated by Olympia. The restraint that existed upon B.D.I. was one allowed by the fair trade law. And the previously discussed evidence of any other unlawful purpose, restricting B.D.I.'s ability to compete, is clearly contradicted. Thus, no violation of the Act is established.

### OLYMPIA'S SEPTEMBER 1967 REFUSAL TO DEAL WITH B.D.I.

The final argument advanced by B.D.I. in support of its substantive position that Olympia violated Section 1 of the Sherman Act is predicated upon Olympia's refusal to deal further with B.D.I. in September 1967. B.D.I. contends that this refusal to deal was a violation of the antitrust laws because it was an additional act in perpetration of an unlawful conspiracy and combination to restrict B.D.I.'s sales to customers other than Safeway. Reliance is placed upon Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) in support of this legal proposition. We fail to find the same comfort in *Albrecht* for B.D.I.'s position on these facts that it does.

■ Nonetheless the question of the wrongful termination vel non of B.D.I. by Olympia was submitted to the jury upon instructions to which no objection was interposed. (Except for the refusal to give 31A which will be commented upon *infra*). Those instructions submitted to the jury the plaintiff's theory of the case and permitted a finding for the plaintiff if the jury found the disputed facts in its favor. The jury did not find for B.D.I. We agree with the trial court that there was ample evidence to support that verdict.

■ The cases appear to clearly establish that a single manufacturer can select his own customers and sell to these and not to any others, at least where there are other and equivalent brands readily available. United States v. Arnold, Schwinn & Co., *supra*, 388 U.S. at 376, 87 S.Ct. 1856; United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke

10. ABC Distributing Co. v. Distillers Distributing Co., 154 Cal.App.2d 175, 316 P.2d 71 (1957).

& Liquors, Ltd., 416 F.2d 71, 78 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Scanlan v. Anheuser-Busch, Inc., 388 F. 2d 918, 921 (9th Cir.), cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968).

"In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." United States v. Colgate & Co., *supra*, 250 U. S. at 307, 39 S.Ct. at 468.

When B.D.I. was first named as a distributor, it was made very plain and in writing that there was no contract for any term. The arrangement was one strictly on an order-by-order basis terminable at will by either party.[11] B.D. I.'s officers admitted at the trial that B.D.I. had no contract with Olympia and they recognized the relationship for what it was. Mr. C. H. Jones, president of B.D.I., R.T. 700; Mr. R. T. Girard, chairman of the board, R.T. 2068–69.

The court, however, instructed the jury that although there was no contract between the parties, and although they were on an order-by-order basis, a termination may be unlawful if done by the brewer as part of and pursuant to an agreement, combination or conspiracy in restraint of trade or commerce within the meaning of the antitrust laws. R.T. 2330. This was appellant's theory. The jury found against appellant.

The appellant complains that the refusal of the court to give its requested instruction No. 31A is reversible error. We do not think so. The substance of 31A was more than adequately covered by the court's instruction. R.T. 2328–70.

The appellant also urges that the court's refusal of its proposed instruction No. 45 constituted reversible error. The instruction had to do with the law-fulness of fair trade agreements. The jury was instructed at length concerning fair trade agreements. We find nothing in the proposed instruction No. 45 which would have added to that which was already given.

## ADMISSION OF IMPROPER EVIDENCE

 Appellant prior to trial filed a motion for a rule excluding evidence.

"Plaintiff moves the court for a ruling that the undisputed facts establish that the restraints imposed by Olympia and its distributors constituted per se violations of the Sherman Act and that evidence of reasonableness or other justification for such restraints will be excluded."

The motion was based upon depositions of corporate officers certain excerpts from which were attached.

We have examined the reporter's transcript to read some of the evidence which appellant in its brief points out as being objectionable within the motion. Yet no objection was interposed by appellant's counsel to its introduction and so far as we have been able to learn, no motion to strike was made. Certainly counsel cannot expect the trial court to *sua sponte* sift the evidence as it comes in to see whether it is within the parameter of appellant's motion, even should we consider, *arguendo*, that it was meritorious.

We do not believe that the point made by appellant is well taken.

## DAMAGES AND INJUNCTION

Considerable evidence was introduced on the question of damages after evidence of liability had been completed. The jury was fully instructed on the question of damages. Both parties submitted their proposals. No objection was made to those instructions as given and no objection raised as to any proffered instruction refused. The jury's verdict was for the defendant.

11. See footnote 1, *supra*.

The injunctive relief sought seeks to enjoin each of the violations which B.D.I. has asserted and the jury has found not to exist. The judgment based on that verdict being affirmed, the prayer for injunctive relief fails.

The judgment is affirmed.